Case No. 23-6075

————————————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

————————————

CHARLES CARROLL,

      Plaintiff – Appellant,

v.

IDEMIA IDENTITY AND SECURITY USA, LLC,

      Defendant–Appellee.

————————————

On Appeal from the United States District Court
for the Middle District of Tennessee (Case No. 3:21-CV-00800)
The Honorable Aleta Trauger

————————————

## APPELLANT'S BRIEF

————————————

Heather Moore Collins
Ashley Shoemaker Walter
HMC CIVIL RIGHTS LAW, PLLC
7000 Executive Center Dr.
Suite 320
Brentwood, TN 37027


*Counsel for Appellant*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-6075          Case Name: Carroll v. Idemia Identity and Security

Name of counsel: Heather M. Collins

Pursuant to 6th Cir. R. 26.1, Charles Carroll

*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

## CERTIFICATE OF SERVICE

I certify that on _____05/07/2024_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Heather M. Collins
7000 Executive Center Dr. Suite 320
Brentwood, TN 37027

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................iv

STATUTES, REGULATIONS, AND RULES.....................................v

STATEMENT IN SUPPORT OF ORAL ARGUMENT.......................vi

STATEMENT OF JURISDICTION..................................................1

STATEMENT OF THE ISSUES........................................................2

STATEMENT OF THE CASE ..........................................................2

I.    FACTS ..............................................................................2

    A. Charles Carroll's Employment History As a High Performer....2

    B. Carroll's Disability Plays a Part Employment Actions Taken Against Him ...........................................................................7

    C. Idemia Forces Carroll into a New Employment Contract to Remove Him from the Company....................................................10

    D. Idemia Places Unrealistic Expectations on Carroll and Refuses to Properly Staff and Allocate Resources to its Trusted Fan Project ..............................................................................................14

    E. Idemia Openly Discussed Discrimination on the Basis of Age and Health..................................................................................21

    F. Idemia Terminates Carroll......................................................22

    G. Idemia Gives Conflicting Reasons for Termination .................27

II.    PROCEDURAL HISTORY................................................30

ARGUMENT ...............................................................................32

I.    THE DISTRICT COURT INCORRECTLY CONCLUDED THAT IDEMIA WAS ENTITLED TO SUMMARY JUDGMENT .......32

    A. Standard of Review..............................................................33

B. The District Court Incorrectly Determined A Reasonable Jury Could Not Conclude that Idemia Violated the ADA and ADEA .............................................................................. 34

   i.  The Reasons for Carroll's Termination were Pretext for Discrimination........................................................ 35

   ii.  The Honest Belief Rule Was Misapplied ................... 43

   iii.  The Inquiries and Statements About Carroll's Disability Made By Casey Were Not Consistent With Business Necessity ................................................................. 51

C. The District Court Incorrectly Concluded There Were Issues of Performance Justifying Breach of Its Contract with Carroll .............................................................................. 53

CONCLUSION ........................................................................ 56

CERTIFICATE OF COMPLIANCE..................................... 57

ADDENDUM ......................................................................... 58

CERTIFICATE OF SERVICE.............................................. 62

# TABLE OF AUTHORITIES

## CASES

*Amos v. McNairy Cnty.*, 622 F. App'x 529, 540 (6th Cir. 2015)............49

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).............33, 34

*ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)........................................................................................53

*Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-458 (2006).....................36

*Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019)..................................................................37, 44, 45, 47

*Barnes v. Robinson Co. v. OneSource Facility Servs. Inc.*, 195 S.W.3d 637, 642 (Tenn.Ct.App. 2006)......................................................54

*Bates v. Dura Auto Sys., Inc.*, 767 F.3d 566, 581 (6th Cir. 2014)..........52

*Biegas v. Quickway Carriers, Inc.,* 573 F.3d 365, 374 (6th Cir. 2009)...33

*Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012)...44, 45

*Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021)..........44

*Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)........37

*Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006)....................33

*Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007)...................................................................................52

*Ferrari v. Ford Motor Co.*, 826 F.3d 885, 892 (6th Cir. 2016)..............34

*Ford v. Gen. Motors Corp.,* 305 F.3d 545, 551 (6th Cir. 2002)..............34

*Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009)............49

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)....................................................................................33

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).....33

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)………………………………………………………34

*Pachla v. Saunders Sys., Inc.*, 899 F.2d 496, 499 (6th Cir. 1990)………36

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 113, 152-152 (2000)……………………………………………………………42,46

*Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 622 (Mich. 1980)……………………………………………………………36

*Turner v. McCullough-Hyde Mem. Hosp.*, 2021 U.S. App. LEXIS 24902, *31 (6th Cir. Aug. 18, 2021)………………………………………44

*Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996)……………………………………………………………54

*Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003)…..35

*Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011)………………35

*Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 811 n.10 (6th Cir. 2020)……………………………………………………………35, 36

*Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707-08 (6th Cir. 2006)….44

*Wright* v. *West,* 505 U.S. 277, 296, 120 L. Ed. 2d 225, 112 S. Ct. 2482 (1992)……………………………………………………………46

## STATUTES, REGULATIONS, AND RULES

28 U.S.C. § 1291………………………………………………………2

28 U.S.C. §§ 1331, 1343(a)(4), and 1367(a)…………………………1

29 U.S.C. § 621………………………………………………………1, 30

31 U.S.C. § 3729-3733…………………………………………………30

42 U.S.C. § 12101………………………………………………1, 30, 51

42 U.S.C. § 12112(d)(4)(A)(1991)……………………………………51

v

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant Charles Carroll respectfully requests oral argument in this case. This appeal principally requires this Court to determine whether the District Court adhered to the summary judgment stadard which required it to draw all inferences in the non-moving party's favor, whereas here, the Court did the opposite and drew its own factual conclusions based on the disputed issues of material fact. Oral argument will allow the parties to highlight the key evidence and clarify the relevance of that evidence within the applicable legal framework.

## STATEMENT OF JURISDICTION

Appellant Charles Carroll appeals the District Court's Order granting Appellee's Motion for Summary Judgment and its Entry of Final Judgment. Memo. Opinion, RE 92, Page ID # 1875-1908; Order, RE 93, Page ID # 1909.

The United States District Court for the Middle District of Tennessee ("District Court") had jurisdiction of this action brought under the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12101, *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*; as well as supplemental jurisdiction for Tennessee common law claims for breach of contract pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 1367(a).

On November 22, 2023, the District Court entered an Order dismissing Carroll's claims after granting Appellee's Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56. MSJ, RE 56, Page ID # 243-247; MSJ Memo., RE 57, Page ID#551-588; Memo. Opinion, RE 92, Page ID # 1875-1908; Order, RE 93, Page ID # 1909; Judgment, RE 94, Page ID # 1910. Pursuant to Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure, Carroll filed a timely notice of

appeal on December 12, 2023. Notice of Appeal, RE 96, Page ID # 1926-1927. This Court has jurisdiction to hear his appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Did the District Court err in granting summary judgment when it drew conclusory, factual and credibility determinations in favor of the movant with respect to pretext and the "honest belief rule" contrary to Rule 56 standards; and

2.  Did it misapply the ADA when it determined inquiries about Carroll's health were consistent with business necessity?

## STATEMENT OF THE CASE

### I.   FACTS

#### A.   Charles Carroll's Employment History as a High Performer

Carroll's career success started long before he joined Idemia Identity and Security USA, LLC ("Idemia"). In 2000, Carroll founded Integrated Biometric Technology, which pioneered the use of fingerprinting and digitization. Complaint, RE 1, Page ID # 3. This technology helped optimize the process of running background checks

2

and resulted in many government contracts. *Id.* Due to his success, Carroll's business was sought after by larger players in the security industry. Complaint, RE 1, Page ID # 4. In 2006, Integrated Biometric Technology was bought by Idemia's preceding business, L-1. Carroll Dep., RE 78-1, Page ID # 1197. Through several corporate mergers and acquisitions over time, L-1 eventually was bought by Idemia. All the while, Carroll ran his Business Unit based on these technologies along with his team in their Franklin, Tennessee office. Complaint, RE 1, Page ID # 4.

At the time of Idemia's formation in 2017, Carroll was selected as the Senior Vice President of Idemia's Enrollment Services Business Unit ("ES"). Carroll's ES was the most financially successful division in Idemia, representing nearly half of the Company's revenue in its North American market at the time of inception. Complaint, RE 1, Page ID # 5. In this role, Carroll's ES was charged with fulfilling Idemia's contract to provide TSA Precheck sign-up services to the federal government. MSJ Ex. 1, sealed RE 80-32, p. 966-967[1]. In 2017, Carroll conceived of and

---

[1] "Sealed RE" indicates a document that was filed under seal in the District Court and counsel does not have access to the Page ID number.

began developing a program for mobile digitization of biometric data for access to the country's largest venues, such as professional sports stadiums and concert arenas. Complaint, RE 1, Page ID # 5. This new program, called "Trusted Fan," ("TF") allowed users to bypass long bag check, personal search, and concession stand lines in exchange for an initial background check and subscription fee. *Id*.

In January 2019, Idemia was awarded the Universal Enrollment Services contract, ("UES2"), a $3 billion contract over 10 years that included responsibility for TSA PreCheck and 5 other federal programs. Carroll Dep., RE 78-1, Page ID # 1202; Complaint, RE 1, Page ID # 5. It was the largest contract awarded in Idemia's history. *Id*. Casey Dep., RE 56-4, Page ID # 1306. Carroll's Business Unit was responsible for the UES2 contract and received the 'Business Unit of the Year' award, with Carroll also recognized as Employee of the Year. Carroll Dep., RE 78-1, Page ID # 1202; Casey Dep., RE 56-4, Page ID # 1306; Brown Dep., RE 78-3, Page ID # 1295-1296; Scott Dep., RE 78-2, Page ID # 1276. After this recognition, Yann Delabriere, CEO of the Global Idemia Group, visited Carroll and his team, based in Nashville, and was "amazed and impressed" by their business unit and praised Carroll himself. Carroll

Dep., RE 78-1, Page ID # 1202, 1209.

At no time during Carroll's tenure did Ed Casey, CEO of Idemia's North American Identity & Security business, or anyone in upper management tell Carroll that they were unhappy with his work performance or that his performance needed improvement. Carroll Dep., RE 78-1, Page ID # 1203, Casey Dep., RE 78-4, Page ID # 1313; *see* Gregory Dep., RE 78-5, Page ID # 1374. Carroll consistently received positive feedback and performance reviews throughout his career with Idemia. In January 2019, Carroll received an overall rating of 100% for his 2018 job performance, noting that he "won UES2," "14% growth in Precheck new enrollments," "Good progress on Trusted Fan business model development, growth strategy, and secured several pilots," "Charlie works very hard, especially on the larger, more strategic issues," "he has vision, is strategic, and very good at delivering results," and "we could have accomplished more during the year (especially in TF) and have been limited by the team (short resources, critical capabilities and talent)." Dep. Ex. 14[2], sealed RE 80-3, p. 6243. *See* Crawley Dep., RE 78-

---

[2] Ex. 14 was initially produced with all the comparators redacted; after intervention from the Court, the full document was produced. For

6, Page ID # 1391-1392; Resp. SOF, RE 90, Page ID # 1837-1838 . For the

same year, Casey rated other managers:

> Employee 1- 90% (Idemia 6232)
> Employee 2- 100%- (Idemia 6233)
> Employee 3- 73% (Idemia 6234-6235)
> Employee 4- 82% (Idemia 6236-6237)
> Employee 5- 85% (Idemia 6238)
> Employee 6- 85% (Idemia 6239-6240)
> Employee 7- 90% (Idemia 6241)
> Employee 8- 110% (Idemia 6242)
> Charlie Carroll- 100% (Idemia 6243)
> Employee 9- 110% (Idemia 6244)
> Employee 10- 81% (Idemia 6245)
> Employee 11- 62.5% (Idemia 6246-6247)
> Employee 12- N/R (Idemia 6248)
> Employee 13- 75% (Idemia 6249)

Thus, of 13 employees rated by Casey, two were rated higher than

Carroll with 110%, and only one other was similarly rated at 100%; the

rest fell below Carroll.[3] Dep. Ex. 14, sealed RE 80-3, pp. 6232-6250. The

comments associated with Carroll's 100% rating indicate that Carroll had

demonstrated "Excellence in Growth" by making "Good Progress on

Trusted Fan business model development, growth strategy and secured

---

clarity's sake, the unredacted version is being referred to as Ex. 14. Ex.
19 was also redacted and the unredacted version is being referred to in
the same manner.

[3] Notably, the man that would replace Carroll in his role in Enrollment
Services, and who ultimately replaced Casey as CEO, was rated lower
than Carroll.

several pilots." Dep. Ex. 14, sealed RE 80-3, p. 6243. Further, Carroll's Business Unit was responsible for the second highest net sales in the company for 2018, amounting to $146 million. Dep. Ex. 44, RE 78-15, Page ID # 1504-1507.

### B. Carroll's Disability Plays a Part Employment Actions Taken Against Him

Carroll has been battling prostate cancer since 2014, seeking various forms of treatment, including from the Mayo Clinic and immunotherapy from a clinic in Germany since 2017. Carroll Dep., RE 78-1, Page ID # 1217-1218. In the spring of 2018, Carroll first informed Casey that he had been battling prostate cancer since 2014. Complaint, RE 1, Page ID # 6. Carroll informed Casey that his cancer had not disrupted his business and that he would inform Casey if anything changed regarding his performance ability. *Id.* Later, in November 2018, Carroll disclosed that he had been back to Mayo Clinic and started on a round of medication that was hard on his body and asked to dial in to an executive committee meeting. Dep. Ex. 26, sealed RE 80-13, p. 417. However, after learning of Carroll's cancer, Casey's attitude towards Carroll's work performance and abilities started to shift. Casey began to ask about Carroll's health constantly, seemingly obsessed with how it was affecting

7

Carroll's ability to work. Carroll Dep., RE 78-1, Page ID # 1210, 1217, 1220, 1229-1230, 1236; *see* MSJ Opp Ex.16, RE 78-14, Page ID # 1503; Dep. Ex. 17, sealed RE 80-4, p. 1273; Dep. Ex. 18, sealed RE 80-5, p. 889; Dep. Ex. 20, sealed RE 80-7, pp. 2652-2653; Dep. Ex. 21, sealed RE 80-8, pp. 1069-1070; Dep. Ex. 22, sealed RE 80-9, p. 1140; Dep. Ex. 25, sealed RE 80-12, p. 1847; Dep. Ex. 26, sealed RE 80-13, pp. 417, 425, 458-459, 462, 464, 466, 468, 496; Dep. Ex. 27, sealed RE 80-14, pp. 1145-1146).

It was clear that Casey was concerned that Carroll's cancer and treatments would cause unexpected disruptions to the workplace or negative reflections on himself. He told Carroll repeatedly, "no surprises. I don't want to surprise the group if something happens to your health." Carroll Dep., RE 78-1, Page ID # 1202; Casey Dep., RE 78-4, Page ID # 1346.[4] He was hyper-focused on how he looked in the eyes of management and did not want Carroll's cancer or treatments to reflect upon any work output that Casey was responsible for. *Id. See* Carroll Dep., RE 78-1, Page ID # 1220.

In January or February of 2019, Carroll informed Casey that he may

---

[4] Casey repeated these remarks frequently. (*See* Carroll Dep. 47, stating "I can't have any surprises. Can't have any surprises. That doesn't look right").

be traveling to Germany to receive treatment. Carroll Dep., RE 78-1, Page ID # 1218. As a result, on March 6, 2019, Casey told Carroll that he would start removing responsibilities "Given Live Nation, MetLife, TF, and UES2 plus the rest of business, *not to mention your upcoming trip to Germany and everything related to that*. I am going to ask Donnie to take the lead on what we discussed today. *Just too much on your plate*. Hope you agree or at least understand." Carroll Dep., RE 78-1, Page ID # 1218; Dep. Ex. 26, sealed RE 80-13, p. 496 (emphasis added).

A month later, in April 2019, Casey and Delabriere began having private discussions regarding Carroll's termination. Dep. Ex. 29, sealed RE 80-16, p. 5639; Dep. Ex. 30, sealed RE 80-17, pp. 5640-5641; Dep. Ex. 31, sealed RE 80-18, p. 6632; MSJ Ex. 6, sealed RE 80-37, p. 5897. They first planned to take him out of the Management Incentive Plan ("MIP") and suggested that he be terminated with an end date of December 31, 2020, with no severance or retirement benefit package "required." *Id.* In doing so, they discussed that it was "critical that he remains on board for passing on to Donnie and even more important to Pierre the key contacts with the clients and support his transition with the clients." Dep. Ex. 31, sealed RE 80-18, p. 6632.

In May 2019, Casey increased his inquiries about Carroll's health and well-being. On May 8, 2019, Casey reached out to Carroll stating, "Hope you are not too sick and feel better soon" and continued to press Carroll for an answer about a demotion from his current role in Enrollment Services into a position Casey created, Senior Vice President of Corporate Development. Dep. Ex. 17, sealed RE 80-4, p. 1273. This new role would significantly reduce Carroll's responsibility of overseeing UES2 implementation and his role in Trusted Fan. Complaint, RE 1, Page ID # 8. Despite Casey's assurance that he was not putting Carroll "out to pasture," Casey tied his suggestions directly to Carroll's health. *Id.* Again, on May 10, Casey asked how Carroll was feeling, and questioned whether he would be able to participate in their VCP presentation or needed another employee, Chris Brown, to cover. Dep. Ex. 16, RE 78-14, Page ID # 1503.

On May 19, 2019, Carroll emailed Casey laying out his concerns with the company's proposal for his demotion and anticipated termination. Dep. Ex. 8, RE 78-10, Page ID # 1468-1470. Carroll's concern was that the move compromised the success of Enrollment Services, the company, the Shareholders, or himself. *Id.*

### C. Idemia Forces Carroll into a New Employment Contract to Remove Him from the Company

Despite his success in 2018, throughout 2019, Idemia continued to take steps to remove Carroll, including forcing him into a two-year non-compete restriction over Carroll's complaints that, given his health and age, such a restriction would prolong his hope to retire. *See* Dep. Ex. 20, sealed RE 80-7, pp. 2652-2653. On June 13, 2019, Casey pressed Carroll for the creation of a steering committee related to moving some of his responsibilities to Donnie Scott.[5] MSJ Ex. 5, sealed RE 80-36, pp. 3435-3436; Dep. Ex. 26, sealed RE 80-13, p. 456. In a subsequent email to Scott, Casey disclosed that he made a proposal to Carroll, and if he did not accept, the company would "immediately decide whether he leaves within days or by the end of the year and announce as soon as possible" Carroll's termination. *Id*. Just days earlier, on June 10, Casey had probed Carroll on gossip he heard that Carroll was planning a trip to Germany. Dep. Ex. 26, sealed RE 80-13, pp. 455-456. Carroll stated his trip was not confirmed, that he was supposed to go two weeks ago but postponed, that

---

[5] At the time of deposition Scott was 47 years old and was Ed Casey's replacement as Idemia's CEO. Scott Dep., RE 78-2, Page ID # 1270.

he was trying to get back on cycle, but he did not want to go without making sure things were on track with TF. Dep. Ex. 26, sealed RE 80-13, p. 456. Per Casey, the creation of a steering committee was, in part, related to Carroll's "hectic travel schedule" *i.e.*, Germany. *Id*.

On June 16, 2019, Carroll emailed Casey informing him that after a period of waiting, a slot opened for him to receive cancer treatment in Germany and that he had already postponed twice, and he could not wait any longer without severe consequences. Dep. Ex. 19, sealed RE 80-6, pp. 4625-4626; Dep. Ex. 20, sealed RE 80-7, pp. 2652-2653. He told Casey he would be in Munich, Germany to receive the treatment from June 17 to 29 and that the treatment would allow him to "recharge" for the next year and a half. *Id*. Upon Carroll's request of confidentiality, Casey agreed to keep the trip on a "need-to-know basis." Dep. Ex. 20, sealed RE 80-7, pp. 2652-2653. Additionally, Carroll expressed concern for the nature of Casey's job proposal for his employment going forward, including the two-year restrictive covenant. *Id.* Despite Carroll's requests for discretion from Casey, his health struggles were discussed during executive committee meetings. Scott Dep., RE 78-2, Page ID # 1272; Casey Dep., RE 78-4, Page ID # 1307-1308; Gregory Dep., RE 78-5, Page ID # 1356;

12

Brown Dep., RE 78-3, Page ID # 1289.

While in Germany, Casey continued to communicate with Carroll to inquire about his health. Dep. Ex. 26, sealed RE 80-13, pp. 458, 462. Carroll divulged that the treatments were "very tough," that it was "more difficult than expected," and that he believed the heavy doses were making it more difficult physically and mentally. Dep. Ex. 26, sealed RE 80-13, pp. 458-459. Nonetheless, despite the grueling treatments, Carroll continued to attempt to work, and Casey continued to expect responses to his inquiries. At no time did Casey refer Carroll to Human Resources regarding his health struggles. Casey Dep., RE 78-4, Page ID # 1311.

After his return, through July, Casey's probing into Carroll's work abilities became more prevalent. In a series of emails, Casey states, "I hope you are feeling a little better" and "I know you are not feeling 100%, so be smart about conserving your energy and building your strength." Dep. Ex. 22, sealed RE 80-9, p. 1140. After contentious negotiations, on July 25, 2019, Casey sent Carroll a letter memorializing official changes to his role and compensation. Carroll Dep. Ex. 4, RE 78-8, Page ID # 1400-1402. The letter proposed that Carroll's position would change from Senior Vice President of Enrollment Services to Senior Vice President of

13

Citizen Services. *Id*. While the letter stated that his position would remain at the same level as Senior Vice President, it demonstrated a stark demotion from his position into one with significantly less responsibility. *Id*. Idemia masked this employment decision as an "evolution," but it effectively removed Carroll from the Business Unit he had worked his whole career to develop, and the one which landed Idemia its largest ever government contract, and moved him to exclusively manage TF, a program which Casey poorly understood and refused to support despite Carroll's many requests for intervention. Dep. Ex. 15, RE 78-13, Page ID # 1502.

### D. Idemia Places Unrealistic Expectations on Carroll and Refuses to Properly Staff and Allocate Resources to Trusted Fan Project

In 2017, Carroll began innovating and developing the "Trusted Fan" program. Idemia designated Trusted Fan as a cornerstone of its Value Creation Plan (VCP), its purpose to prioritize quickly growing units and help facilitate the company's Initial Public Offering (IPO). Carroll Dep., RE 78-1, Page ID # 1205; *see* Scott Dep., RE 78-2, Page ID # 1275; Brown Dep., RE 78-3, Page ID # 1295; Gregory Dep., RE 78-5, Page ID # 1360; Kallelis Dep., sealed RE 80-2, p. 45. However, as early

as March 2018, Carroll began addressing his concerns to Casey and Delabriere about the staffing and commitment to TF; by June 2019, Carroll was more adamant and outlined specific details regarding what it would take for the program to succeed, but warned TF would never succeed at the rate it was going. Carroll Dep., RE 78-1, Page ID # 1204; MSJ Ex. 1, sealed RE 80-32, pp. 966-967; Dep. Ex. 9, RE 78-11, Page ID # 1471-1473.

Carroll's initial revenue projections for TF were realistic, but in 2019, Idemia drastically changed its revenue expectations for TF to enhance its potential to take the company public. Carroll Dep., RE 78-1, Page ID # 1204-1205; *see* MSJ Ex. 2, sealed RE 80-33, pp. 1507-1515 at p. 1507 (EBITDA for 2018: -4, 2019: 1, 2020-8)[6]. The corporate team would take Carroll's team's presentations and revenue assumptions and enhance or "goose[] up" the numbers to enhance TF's VCP for a potential public offer. Carroll Dep., RE 78-1, Page ID # 1205, 1228. Carroll consistently was trying to keep up with Idemia's unrealistic expectations and overnight changes in revenue expectations. Carroll Dep., RE 78-1,

---

[6] EDITDA is "Earnings Before Interest, Taxes, Depreciation and Amortization."

Page ID # 1205-1206, Dep. Ex. 9, RE 78-11, Page ID # 1471-1473. Any financial assumptions that were made were heavily dependent on having the technology, which was a critical part of the business model. Carroll Dep., RE 78-1, Page ID # 1206,1212; Dep. Ex. 9, RE 78-11, Page ID # 1471-1473. However, Idemia corporate insisted that TF needed to use Digital Labs to create the technology under the premise that the technology would be the same across business lines. Carroll Dep., RE 78-1, Page ID # 1209-1210. This decision and the revenue models made by corporate, not Carroll, were all based on a fundamental misunderstanding of TF concept. Carroll Dep., RE 78-1, Page ID # 1212-1213. Nonetheless, despite the technology holdups caused by Digital Labs' lack of progress, revenue was made through wave technology that got off the ground at the same time. Carroll Dep., RE 78-1, Page ID # 1213-1214; MSJ Ex. 4, sealed RE 80-35, pp. 2575-2577.

The TF projections by Carroll's team were not fantasy or made in a vacuum; instead, Idemia's finance team made projections for TF's revenue-generating ability that were above what Carroll believed was possible given the state of the project at the time, as did Chris Brown, a CPA, who worked with Carroll on budgetary issues. Carroll Dep., RE 78-

1, Page ID # 1205; Brown Dep., RE 78-3, Page ID # 1297. However, even Dennis Kallelis, Idemia's Chief Security Officer and CFIUS appointee – who has a double master's degree in computer science and math and a self-proclaimed "very good market sense and business savvy" – agreed the TF numbers Carroll was presenting to the executive committee for TF were valid, reasoning he does not run on gut feels, "it's numbers." Kallelis Dep., sealed RE 80-2, p. 48. In fact, Kallelis stated that there were conversations about Carroll's ability to create the TF market and he believed Carroll demonstrated the skill set with "confidence and integrity" to create that market. Kallelis Dep., sealed RE 80-2, pp. 17-20.

Throughout his tenure, Carroll continued to press Casey on what needed to change for TF to succeed. Carroll Dep., RE 78-1, Page ID # 1206). Instead of addressing the operational issues, Casey began a months-long campaign to move Carroll out of his successful role in enrollment services into a newly created role with less responsibility, making the claim that Carroll needed a singular focus for TF to succeed. Carroll Dep., RE 78-1, Page ID # 1206; Scott Dep., RE 78-2, Page ID # 1273; Casey Dep., RE 78-4, Page ID # 1314; Gregory Dep., RE 78-5, Page ID # 1359; *see* Dep. Ex. 5, RE 78-9, Page ID # 1403-1467; Dep. Ex. 9, RE

78-11, Page ID # 1471-1473; Dep. Ex. 21, sealed RE 80-8, pp. 1069-1070; Dep. Ex. 41, sealed RE 80-26, pp. 2096-2097; Dep. Ex. 42, sealed RE 80-27, pp. 2425-2428. There was deep-seated tension between Casey and Carroll regarding TF's potential. *See* Carroll Dep., RE 78-1, Page ID # 1211; Casey Dep., RE 78-4, Page ID # 1310. At one point, in July 2019, while Carroll was working to establish inroads with NFL teams, Casey blew off a meeting at the last minute with the owners of two NFL teams that Carroll had set up. Carroll Dep., RE 78-1, Page ID # 1235. This was a devastating setback because word spread through the NFL that Idemia was not a company that could be trusted. Carroll Dep., RE 78-1, Page ID # 1235. In response to Casey's insult, the teams cut off communication with Carroll for months. *Id*. This pattern continued – Casey refused to approve other deals Carroll had worked tirelessly on. Carroll Dep., RE 78-1, Page ID # 1235-1236. Most of Casey's discomfort with the deals was based on his own lack of understanding, not the potential of the TF program. *Id*. Thus, TF program was used as an excuse to fire Carroll and one which Casey undermined on multiple fronts. Carroll Dep., RE 78-1, Page ID # 1212. In contrast, Casey testified that he started getting "skeptical" about TF and he was not satisfied with Carroll's progress as

early as January 2019, but this is not only contradicted by the evaluation he gave Carroll, but also by the fact that Carroll was subsequently given more money to stay with Idemia and exclusively run TF (although Carroll was terminated before he was able to realize any incentives). Casey Dep., RE 78-4, Page ID # 1310; Dep. Ex. 4, RE 78-8, Page ID # 1400-1402. In fact, on May 8, 2019, Casey first offered Carroll the option of keeping TF, enrollment Services *or* a new job title of "Corporate Development." Dep. Ex. 17, sealed RE 80-4, pp. 1273-1274. It is illogical that Carroll was such a poor performer, yet he was being offered multiple choices to stay.

Despite TF being named as one of the core pillars of Idemia's VCP, it did not have a dedicated staff until July 2019. Brown Dep., RE 78-3, Page ID # 1298; Scott Dep., RE 78-2, Page ID # 1279-1280. Idemia understaffed and underfunded the program and later Casey claimed he terminated Carroll because he believed TF would not be profitable. *See generally* Casey Dep., RE 78-4, Page ID # 1333-1335. Over months, Carroll repeatedly brought the staffing and funding issues to Casey's and Delabriere's attention. In both one-on-one and executive committee meetings, Carroll raised concerns throughout 2019 about outsourcing TF technology to Digital Labs, headed up by Juda Marek, because they were

19

slow, failed to follow up on deadlines and appeared dishonest. Carroll Dep., RE 78-1, Page ID # 1206, 1209-1210; Dep. Ex. 8, RE 78-10, Page ID # 1468-1470; Dep. Ex. 41, sealed RE 80-26, pp. 2096-2097. Casey knew Carroll needed resources and promised to act quickly to fund the technology and make way for the program's development. Carroll Dep., RE 78-1, Page ID # 1206, 1234. On September 12, 2019, Carroll traveled with his TF team to meet with Marek about setting goals for Digital Labs' completion of TF projects. Dep. Ex. 41, sealed RE 80-26, pp. 2096-2097. Indeed, during those same meetings, on September 12, Carroll and Casey were communicating privately about a meeting where Marek was being called out for lack of speed of completion and Casey bragged "I am just beginning to crawl all over him," and "we [Casey and Carroll] are going to drive change." Dep. Ex. 26, sealed RE 80-13, p. 480.

Then, the following day, when Casey was consulting with Carroll about dates for completion of the TF applications to be completed by Digital Labs, Carroll insisted on completion by end of year, before the 2020 events games began. Dep. Ex. 26, sealed RE 80-13, p. 103. Nonetheless, through October 10, 2019, Carroll continued to receive information that TF was not on Digital Labs' "roadmap" which Carroll

continued to take up the chain of command, to no avail. Dep. Ex. 41, sealed RE 80-26, pp. 2096-2097. As predicted by Carroll, by October 10, 2020, his team provided information that nearly every task assigned to Digital Labs was assigned was "at risk" and all future projections were geared toward the 2020 MLB, NFL and NBA season. MSJ Opp. Ex. 3, sealed RE 80-34, pp. 1841-1843 (TF Roadmap). Likewise, on October 29, 2019, Carroll continued to raise the alarm that Marek/Digital Labs was not treating TF as a priority, a fact which Casey feigned surprise and ignorance. Dep. Ex. 42, sealed RE 80-27, p. 2425; Dep. Ex. 43, sealed RE 80-28, pp. 3290-3293; Casey Dep., RE 78-4, Page ID # 1343-1345.

### E. Idemia Openly Discussed Discrimination on the Basis of Age and Health

Casey's generalized assumptions about Carroll's ability to perform were not limited exclusively to his health, but also his age. Casey expressed in repeated conversations with Carroll his belief and desire to have a younger person running each business unit at Idemia. Carroll Dep., RE 78-1, Page ID # 1216. Moreover, multiple executives confirmed ongoing conversations at Idemia about the company's "aging workforce" and their desire to hire younger talent. Scott Dep., RE 78-2, Page ID # 1271; Casey Dep., RE 78-4, Page ID # 1327; Gregory Dep., RE 78-5, Page

21

ID # 1358; Brown Dep., RE 78-3, Page ID # 1290; Kallelis Dep., sealed RE 80-2, pp. 32-33; Carroll Dep., RE 78-1, Page ID # 1206-1207,1217.

While Casey was in Nashville discussing the UES2 contract with Carroll, Casey directly questioned Carroll's ability to do his job based on his age. (Carroll Dep. 72). While at dinner, Casey repeatedly asked Carroll why he would "still want to do the heavy lifting" at his age, and asked him why he was "working so hard" and "doing this at your age?" Carroll Dep., RE 78-1, Page ID # 1206; Casey Dep., RE 78-4, Page ID # 1347. Likewise, at meetings, Casey tried to discuss the "elephant in the room" about the issue of their "aging workforce," to which HR employees would redirect the conversation and coach them to not mention protected groups while discussing the reason for their employment issues. Carroll Dep., RE 78-1, Page ID # 1206-1207, 1218; Casey Dep., RE 78-4, Page ID # 1327; *see* Brown Dep., RE 78-3, Page ID # 1290; Scott Dep., RE 78-2, Page ID # 1271; Gregory Dep., RE 78-5, Page ID # 1358.

### F. Idemia Terminates Carroll

After 19 years of relentless dedication and service to Idemia, without warning or documentation, the company notified Carroll, along with the rest of the company, of his termination on November 6, 2019.

22

Dep. Ex. 35, sealed RE 80-22, p. 1504. Internal drafts with various reasons for his departure started being circulated on October 24, 2019. Dep. Ex. 32, sealed RE 80-19, p. 5707. The initial draft stated Carroll has another opportunity he needs to pursue and he was thanked for his "monumental contributions" and it was communicated he was being replaced by Ajay Amlani. *Id.* Another October 24 version acknowledged Carroll "recently led and helped secure our recent win on UES2," but just noted that this was an immediate change in leadership. Dep. Ex. 33, sealed RE 80-20, p. 7158. On November 5, 2019, Delabriere notified an Advent member that Casey had management issues with Carroll "particularly as regards his *capacities* for running Trusted Fan" and while Delabriere noted Carroll "initiated this important project, with a good business vision and established contact with the sports teams and Live Nation/TicketMaster" after three months he was being blamed for delays, per Casey. MSJ Ex. 7, sealed RE 80-38, p. 6202. This letter is the only document of thousands produced that preceded the actual termination that even comes close to outlining a reason.

By November 6, 2019, Idemia settled on "we are parting ways with Charlie Carroll" and acknowledged his "many contributions to Idemia"

all while refusing to acknowledge the UES2 win. Dep. Ex. 35, sealed RE 80-22, p. 1504. Likewise, the Executive Committees in the U.S. and France were notified by Casey on November 6, 2019, both communications acknowledged Ajay Amlani, a new hire under the age of 40, was replacing Carroll and they were encouraged not to discuss due to sensitivity with settlement discussions that would continue through the next week. Dep. Ex. 37, sealed RE 80-24, p. 5899; *See* Scott Dep., RE 78-2, Page ID # 1270, 1277; Casey Dep., RE 78-4, Page ID # 1310-1311, 1326.

In the days leading up to Carroll's termination a few significant events occurred (in addition to the discussion regarding age and health set forth *supra*). The September meeting with Marek/Digital Lab contradicts that Carroll was responsible for the slow development of TF, and Casey previously acknowledged this. Carroll Dep., RE 78-1, Page ID # 1242-1244; Dep. Ex. 26, sealed RE 80-13, pp. 480-481. At no point did Casey insinuate or expressly state to Carroll that he was not doing a satisfactory job, more importantly, no performance concerns were documented by Casey or anyone else. Carroll Dep., RE 78-1, Page ID # 1246; Casey Dep., RE 78-4, Page ID # 1347-1348; *see* Gregory Dep., RE 78-5, Page ID # 1374. This is likely because Casey knew Carroll had no

authority over solving the inherent problems with TF, which were directly tied to Casey and Delabriere's insistence TF use Digital Labs. *Id.* Regardless, Casey contended the responsibility to make TF succeed fell at Carroll's feet and he became the perfect scapegoat for its unfortunate demise. *Id.* Casey's actions were purposefully geared towards putting Carroll in a place where he seemed like a liability to TF's success. Carroll Dep., RE 78-1, Page ID # 1247. Overall, Casey intentionally stonewalled TF's success because he did not want Carroll's disability or age to become a problem for him and his own achievements at Idemia.

On October 10, Carroll again expressed his frustration with the lack of allocation of resources for TF, stating, "I am at the end of my rope, and we are again spinning in circles." Dep. Ex. 41, sealed RE 80-26, p. 2096; Casey Dep., RE 78-4, Page ID # 1342. On October 21, Carroll emailed Casey stating that he was "off sick but working" and an update that Carroll had a medical test the following day and was awaiting an appointment with MD Anderson, a leading cancer center. (Ex. 24). In his deposition, Casey admitted he regarded MD Anderson as somewhere patients go if they have "serious cancer." Casey Dep., RE 78-4, Page ID # 1318. Additionally, texts from October 21, 22, and 23 show that Carroll

communicated health issues and that he was coming in late or going to miss a meeting. Dep. Ex. 26, sealed RE 80-13, pp. 485-486. Casey seemed to accommodate, telling him not to come in if he was sick. *Id.* All the while, Carroll was transparent that he was "feeling ok, but not totally up to par." *Id.* Additionally, just prior to the September meeting, Carroll had to request to attend an executive meeting remotely because he was not feeling well due to transitioning off medications he was on in Germany. Dep. Ex. 23, sealed RE 80-10, p. 1726. Indeed, just days later Carroll was added as an executive committee discussion topic. Dep. Ex. 34, sealed RE 80-21, p. 6324.

It was not until weeks after his termination that HR decided to term Carroll's termination for "cause" but even so, it has hidden behind a thin assertion of privilege to do so. In other words, Idemia blocked discovery of alleged facts about its supposed "cause" finding. On November 15, 2019, Carroll and Karen Gregory, Senior Vice President of Human Resources, spoke on the phone to discuss the termination. Dep. Ex. 48, sealed RE 80-29, pp. 7015-7018. On November 19, 2019, Carroll emailed Gregory following up on their conversation, stating that he felt intimidated, fearful, and apprehensive during the phone call. Dep. Ex.

49, sealed RE 80-30, p. 3976. Moreover, he stated that he felt like there were people in the room and that the phone conversation was being recorded. *Id.* Lastly, Carroll stated that the stress caused by the termination overall in addition to his health circumstances has had a "tremendously negative effect" on him. *Id.* On November 21, Gregory emailed Carroll a separation agreement. Dep. Ex. 51, sealed RE 80-31, p. 3954. On December 10, Carroll responded to Gregory's email challenging the severance compensation he was owed pursuant to the July 25 contract renegotiating his employment. Dep. Ex. 52, RE 78-16, Page ID # 1508-1526; Dep. Ex. 4, RE 78-8, Page ID # 1400-1402. The proposed separation agreement provided for only a portion of the severance pay agreed upon in his contract because of the unjustified "cause" determination. Complaint, RE 1, Page ID # 17. The company also withheld the promised bonus Carroll earned for securing the TSA contract. *Id.*

### G. Idemia Gives Conflicting Reasons for Termination

Idemia has not been consistent about exactly why it terminated Carroll's employment, to the contrary, its reasoning got more hyperbolic with time. When he was terminated, Casey told Carroll they were "going

in a different direction." Carroll Dep., RE 78-1, Page ID # 1249. Casey has no basis to dispute Carroll's recollection because he "does not recall" the specific conversation or the precise words, HR Gregory had the same inability to recall the reasons for Carroll's termination. Casey Dep., RE 78-4, Page ID # 1339; Gregory Dep., RE 78-5, Page ID # 1363-1364. Carroll's separation from Idemia became effective on November 21, 2019. Dep. Ex. 51, sealed RE 80-31, p. 3954. In a letter from Gregory to Carroll, she states that "although cause is not required for your termination, we believe cause exists for both underperformance and misconduct." *Id.* Gregory did not explain what instances of underperformance or misconduct warranted his termination. *Id.* At the same time, Casey testified in his deposition that Carroll was terminated because they had lost confidence in his ability to lead and execute his plan for TF's success. Casey Dep., RE 78-4, Page ID # 1334. Despite Idemia's sworn testimony that it was Casey who initiated the recommendation to terminate Carroll, he argues that it was a group decision that he could not make himself. Resp. to Interrogatory, RE 56-5, Page ID# 452-453; Casey Dep., RE 78-4, Page ID # 1310. Nevertheless, Casey stated that he merely supported Idemia's decision. Casey Dep., RE 78-4, PageID #1335.

28

Post termination, Idemia ramped up its campaign to ruin Carroll and force him into releasing his claims, guarantee confidentiality and sign a severance worth significantly less than what he was owed under the terms of his contract. Dep. Ex. 52, RE 78-16, Page ID # 1508-1526; Dep. Ex. 4, RE 78-8, Page ID # 1400-1402. In doing so, it allegedly found evidence that he engaged in vaguely defined misconduct, but it has hid behind an assertion of privilege to secret any alleged substantiation of these allegations.[7] Resp. to Interrogatory, RE 56-5, Page ID# 457-458, 460; Crawley Dep., RE 78-6, Page ID # 1383-1384; Dep. Ex. 8, RE 78-10, Page ID # 1470; Kallelis Dep., sealed RE 80-2, pp. 38-40 (Kallelis has no understanding why Carroll was terminated, would be surprised if he was accused of misconduct, not allowed to answer questions about whether he was asked to gather information after his termination); Scott Dep., RE 78-2, Page ID # 1281 (no discussions in EC meetings about Carroll engaging in unethical behavior). Similarly, Robert Lawson, former HR Director, who was pulled in as a note taker on a post termination call

---

[7] Gregory, the HR Manager who was involved in Carroll's termination and alleged investigation had no recollection of the circumstances of his termination, nor any associated investigation. Gregory Dep., RE 78-5, Page ID # 1367-1369.

with Carroll and former HR Director Gregory, had never seen typed notes that were attributed to him, rather he only recalled submitting handwritten notes (which were not produced under the veil of privilege) and he denied knowledge or otherwise being involved in any investigation concerning Carroll. Lawson Dep., RE 78-7, Page ID # 1397-1398; Dep. Ex. 48, sealed RE 80-29, p. 7018.

## II.    PROCEDURAL HISTORY

On October 19, 2021, Carroll filed a Complaint in the Middle District of Tennessee alleging violations of Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12101, *et seq*.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*.; the False Claims Act ("FCA"), 31 U.S.C. § 3729-3733; as well as common law claims for breach of contract after he was summarily terminated due to his age and disability, resulting in a breach of employment contract. Complaint, RE 1, Page ID #1-28.

After the close of fact discovery, Appellee Idemia Identity and Security USA, LLC ("Idemia") moved for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. MSJ, RE 56, Page ID # 243-247; MSJ Memo., RE 57, Page ID # 551-588, Stmt. Of Facts, RE 58, Page ID

# 589-648. Idemia argued Carroll's termination was not because of his age or disability, but rather pretextual justifications surrounding Carroll's job performance. *Id*.

Carroll responded in opposition to Idemia's Motion by submitting numerous exhibits and deposition citations which established disputed issues of material fact that a reasonable jury could use to determine Carroll's termination was because of his disability or age, not the after-the-fact, shifting justifications given by Idemia. Opp. MSJ, RE 76, Page ID # 1053-1085; Resp. to SOF, Add'l SOF, RE 77, Page ID # 1086-1184; Notice of Exhibits, RE 78-78-17, Page ID # 1185-1526; Notice of Sealed Exhibits, RE 80-80-30. Carroll also filed a motion in limine seeking to exclude reference to any alleged investigation or allegations of misconduct that occurred after Carroll was notified of his termination due to Idemia's assertion of privilege and refusal to produce any information that such an investigation existed. Mot. *in Limine*, RE 81, Page ID # 1813-1817. On November 3, 2023, Idemia filed a reply to Carroll's opposition. Reply to Opp. MSJ, RE 91, Page ID # 1863-1874.

On November 22, 2023, the District Court entered an Order dismissing Carroll's claims after granting Appellee's Motion for

Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56. Memo. Opinion, RE 92, Page ID # 1875-1908; Order, RE 93, Page ID # 1909. The Clerk entered an Entry of Judgment on November 22, 2023. Judgment, RE 94, Page ID # 1910. The District Court recognized Carroll demonstrated a prima facie case of discrimination with respect to both disability and age discrimination; however, it ultimately determined that Carroll was unable to demonstrate pretext for age or disability discrimination under the "honest belief" rule, and likewise determined the same held true to Carroll's breach of contract claim. (Memo. Opinion, RE 92, Page ID # 1875-1908). As such, this appeal followed.

## ARGUMENT

### I. THE DISTRICT COURT INCORRECTLY CONCLUDED THAT IDEMIA WAS ENTITLED TO SUMMARY JUDGMENT

The District Court incorrectly concluded that Idemia was entitled to judgment as a matter of law for Carroll's claims under the ADA and ADEA on the premise that Carroll failed to demonstrate that this change in job and ultimate termination were pretext for unlawful discrimination. In doing so, it also determined incorrectly that there were no issues of fact concerning Carroll's breach of contract claims.

## A. Standard of Review

This Court reviews a district court's grant of summary judgment *de novo. Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same." *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 250-251, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); see also *Celotex Corp.* v. *Catrett,* 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." *Biegas v. Quickway Carriers, Inc.,* 573 F.3d 365, 374 (6th Cir. 2009). A dispute about a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the non-moving party." *Ford v. Gen. Motors Corp.,* 305 F.3d 545, 551 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).]

## B. The District Court Incorrectly Determined A Reasonable Jury Could Not Conclude that Idemia Violated the ADA and ADEA

Pursuant to the familiar burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the employee must first establish a "*prima facie* case of discrimination." Here, the District Court correctly determined that Carroll satisfied the prima facie inquiry with respect to both his age and disability claims. Memo. Opinion, RE 92, Page ID # 1897. Once the employee meets its prima facie burden, the employer must then offer a "legitimate explanation for its action." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 892 (6th Cir. 2016). After the employer does that, "the burden then shifts back to the [employee], who must introduce evidence showing that the [employer's] proffered explanation is pretextual." *Id.* (quotation omitted)

At summary judgment, the employee "need not *prove* that the [employer's] proffered rationale is pretextual, as that would be enough

proof for summary judgment in favor of the [employee]." *Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011). Rather, the employee "must prove only enough to create a *genuine issue* as to whether the rationale is pretextual." *Id.*

i. The Reasons for Carroll's Termination were Pretext for Discrimination

The District Court recognized that Idemia's proffered "legitimate reason for termination" was due to "mismanagement of Trusted Fan." Memo. Opinion, RE 92, Page ID # 1901. However, the District Court assumed that "[t]he decision to fire [Carroll], then, was likely a considered one…It is therefore relatively implausible that Idemia would have made such a decision based on a flimsy or obviously mistaken rationale." Memo. Opinion, RE 92, Page ID # 1903. But yet, that is exactly what the facts show Idemia did, which should have placed the analysis squarely outside the "honest belief" analysis.

A plaintiff can demonstrate pretext by showing: (1) the proffered reason has no factual basis; (2) the reason did not actually motivate the decision; or (3) the articulated reason is insufficient to justify the adverse action taken. *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc). *See Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 811

n.10 (6th Cir. 2020) (noting that the "three-part test" for pretext should not be treated "rigidly").

"Where the employer alleges that the employee was discharged for one reason . . . and the employee presents evidence that he was really discharged for another reason . . . the question . . . is one of fact for the jury. The jury is always permitted to determine the employer's true reason for discharging the employee." *Pachla v. Saunders Sys., Inc.*, 899 F.2d 496, 499 (6th Cir. 1990), citing *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 622 (Mich. 1980). Additionally, the Supreme Court has cautioned that pretext need not "virtually jump off the page and slap you in the face" and indeed such rigor is not necessary and is "unhelpful and imprecise." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-458 (2006). The Sixth Circuit favors reasonableness in pretext analysis:

> However, the [employee] may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation. *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)). And, of course, we must always keep in mind that, at summary judgment, the employee "need not *prove* that the [employer's] proffered rationale is pretextual, as that would be enough proof for summary judgment in favor of the [employee" *Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir.

36

> 2011). Rather, the employee "must prove only enough to create a *genuine issue* as to whether the rationale is pretextual." *Id.*

*Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019). Ultimately, when determining pretext, the court should employ a "commonsense inquiry" and ask: "did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009).

Carroll offered multiple reasons that demonstrated Idemia's rationale was not reasonable and thus, pretextual:

- Idemia corporate insisted on using Digital Labs as the electronic platform. Carroll had been making noise for months about Digital Labs' incompetence and failure to adhere to deadlines. Carroll Dep., RE 78-1, Page ID #1204, 1206; MSJ Ex. 1, sealed RE 80-32, pp. 966-967; Dep. Ex. 9, RE 78-11, Page ID #1471-1473. Casey knew this, continued to act surprised by the ongoing failures, and provided ineffective leadership, but yet Carroll was inexplicably terminated. Dep. Ex. 42, sealed RE 80-27, p. 2425-2428; Dep. Ex. 43, sealed RE 80-28, p. 3290-3293; Casey Dep., RE 78-4, Page ID #1343-1345.

- Corporate changed revenue projections for TF drastically in 2019,

not Carroll. (Carroll Dep. 65-67; MSJ Ex. 2, Idemia 1507-1515; Ex. 9). And then, Idemia undermined Carroll's ability to meet benchmarks by insisting on using Digital Labs. Carroll Dep., RE 78-1, Page ID #1209-1210; Dep. Ex. 41, sealed RE 80-26, p. 2096-2097; Casey Dep., RE 78-4, Page ID # 1342.

- There was no discussion of moving Carroll out of his position until he began to divulge more details about his cancer treatments to Casey. Carroll Dep., RE 78-1, Page ID # 1218; Dep. Ex. 26, sealed RE 80-16, p. 496; Dep. Ex. 29, sealed RE 80-16, p. 5639; Dep. Ex. 30, sealed RE 80-17, pp. 5640-5641; Dep. Ex. 31, sealed RE 80-18, p. 6632; MSJ Ex. 6, sealed RE 80-37, p. 5897.

- Idemia knew that TF did not hinge on Carroll alone, as in-depth discussions had been made that revenue in 2019 was not projected to be high and that the entire project hinged on Digital Lab's creation of the TF platform. MSJ Ex. 9, sealed RE 80-39, pp. 1882-1937 (excerpts).

- Delabriere made it clear that one of his objectives was to get Carroll to pass along as much of his institutional knowledge and contacts as soon as possible to a younger employee. Dep. Ex. 29, sealed RE

80-16, p. 5639; Dep. Ex. 30, sealed RE 80-17, pp. 5640-5641; Dep.

Ex. 31, sealed RE 80-18, p. 6632; MSJ Ex. 6, sealed RE 80-37, p.

5897. This came on the heels of Carroll telling Casey he was going

to Germany for cancer treatment. Dep. Ex. 26, sealed RE 80-12, p.

496.

- Casey directly stated that he was taking things off Carroll's plate

  due to his trip to Germany, *i.e.*, his treatment for cancer. Carroll

  Dep., RE 78-1, Page ID # 1218; Dep. Ex. 26, sealed RE 80-13, p. 496.

- At the beginning of 2019, Carroll was hailed as a 100% performer

  and was recognized as the business unit leader responsible for

  Idemia's UES2 win, its largest contract; then his job duties began

  to be divided among numerous other employees, all after he

  disclosed he needed to start up cancer treatment again. Casey Dep.,

  RE 78-4, Page ID # 1306; Carroll Dep., RE 78-1, Page ID # 1202;

  Brown Dep., RE 78-3, Page ID # 1295-1296; Dep. Ex. 14, sealed RE

  80-3, p. 6243. Additionally, in 2018, Carroll's Business Unit was

  responsible for the second highest sales in the company. Dep. Ex.

  44, RE 78-15, Page ID # 1504-1507.

- Mere days prior to his termination, Carroll disclosed he was

awaiting an appointment at MD Anderson, that Casey admitted he regarded as a place for serious cancer. Dep. Ex. 24, sealed RE 80-11, p. 4641; Casey Dep., RE 78-4, Page ID # 1318.

- Prior to his termination, there was **no** documentation of performance concerns, nor was Carroll told his job was in jeopardy. Carroll Dep., RE 78-1, Page ID # 1203, 1246; Casey Dep., RE 78-4, Page ID # 1347-1348. *See* Gregory Dep., RE 78-5, Page ID # 1374.

- Kallelis, Idemia's chief security officer and CIFIUS agent, believed that "the numbers" Carroll was presenting regarding TF, as well as his business plan, were solid. Kallelis Dep., sealed RE 80-2, pp. 17-20, 48.

- There were ongoing conversations at Idemia about the company's high costs of health insurance due to its "aging workforce" and their desire to hire younger talent. Scott Dep., RE 78-2, Page ID # 1271; Casey Dep., RE 78-4, Page ID # 1327; Gregory Dep., RE 78-5, Page ID # 1358; Brown Dep., RE 78-3, Page ID # 1290; Kallelis Dep., sealed RE 80-2, pp. 32-33; Carroll Dep., RE 78-1, Page ID # 1206-1207, 1217.

- After the fact Casey claimed, without documentation, that one of

40

the reasons for termination was because Idemia did not believe 2020 revenue projections (not 2019) could be met and that key assumptions could not be met. Casey Dep., RE 78-4, Page ID # 1333-1334. Casey also admitted that he did not know whether Carroll's alleged failures to meet key assumptions was documented. Casey Dep., RE 78-4, Page ID # 1334.

Accordingly, Carroll set forth disputed facts to create a *genuine issue* as to whether Idemia's rationale for changing his job duties and termination were pretextual. However, rather than drawing all inferences in Carroll's favor, as the Court was required to do, it instead argued against them taking the role of the factfinder, making improper credibility determinations and inferences. Memo. Opinion, RE 92, Page ID # 1903-1907.

To be sure, the District Court drew the conclusion that "disagreements surrounding Trusted Fan bolsters, rather than undermines, Idemia's asserted reason for his dismissal" and "Carroll's focus on Idemia's mishandling of Trusted Fan, then looks conspicuously like an explanation why…Carroll- would need to be fired." Memo. Opinion, RE 92, Page ID # 1904. These are impermissible factual

conclusions and credibility determinations drawn in Idemia's favor, not Carroll's. Likewise, the District Court drew the conclusion that complaints about financial projections were misplaced "with the straightforward rule that the buck stops with the person at the top" (even though Casey, not Carroll was the "person at the top"). Memo. Opinion, RE 92, Page ID # 1904. However, in making these assumptions, the District Court incorrectly usurped the role of the factfinder by concluding "[m]aybe the firing was justified, or maybe Casey foisted blame on Carroll in order to protect himself. In neither scenario, however, was anything done to Carroll based on his age or his disability." Memo. Opinion, RE 92, Page ID # 1904. Again, this conclusory statement ignores the age and disability related context and comments that were made. Scott Dep., RE 78-2, Page ID # 1271; Casey Dep., RE 78-4, Page ID # 1327, 1347; Gregory Dep., RE 78-5, Page ID # 1358; Brown Dep., RE 78-3, Page ID # 1290; Kallelis Dep., sealed RE 80-2, pp. 32-33; Carroll Dep., RE 78-1, Page ID # 1206, 1217. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 113, 152-152 (2000) (discounting age related comments by decisionmaker as not being made in the context of plaintiff's termination was error.)

42

Additionally, when Carroll and the rest of the company was notified, there was no mention of misconduct or performance. Dep. Ex. 35, sealed RE 80-22, p. 1504; Dep. Ex. 36, sealed RE 80-23, p. 2393. The only documentation that even comes close is the note from November 5, 2019, where Delabriere notified an Advent member that Casey had management issues with Carroll "particularly as regards his *capacities* for running Trusted Fan" and while Delabriere noted Carroll "initiated this important project, with a good business vision and established contact with the sports teams and Live Nation/TicketMaster" after three months he was being blamed for delays, per Casey. MSJ Ex. 7, sealed RE 80-38, p. # 6202. However, this note came after the decision had already been made, and the statement about Carroll's "capacities" could be read by a jury as an indication of disability or age discrimination.

Accordingly, the judgment of the District Court as it pertains to Carroll's evidence of pretext must be reversed.

### ii.  The Honest Belief Rule Was Misapplied

The honest-belief rule only applies where a plaintiff is seeking to establish pretext that defendant's proffered reason had no basis in fact at the time the decision was made. *Briggs v. Univ. of Cincinnati*, 11 F.4th

498, 515 (6th Cir. 2021). In other words, it is Idemia's burden to "establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Turner v. McCullough-Hyde Mem. Hosp.*, 2021 U.S. App. LEXIS 24902, *31 (6th Cir. Aug. 18, 2021)(citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707-08 (6th Cir. 2006)); *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012) ("This court has adopted a modified honest belief rule, which provides that for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made"). Moreover, the honest belief rule does not apply where the employee claims that an employer failed to make a "reasonably informed and considered" decision in taking adverse action. *Babb*, 942 F.3d at 323. In *Babb*, this Court distinguished between instances where the employee is challenging "the likelihood that a *reasonable* [employer] would have *actually relied on those facts* to fire an experienced [employee]," as an exception to the rule. *Id*. As such, the honest belief rule has no application here because Idemia did not make a reasonably informed decision.

44

Likewise, Carroll challenges the District Court's honest belief analysis because Idemia did not have a "reasonable reliance on the particularized facts that were before it at the time the decision was made" nor did it make a "reasonably informed and considered" decision in taking adverse action against Carroll which should have placed it outside the honest belief analysis. *See Blizzard*, 698 F.3d at 286; *Babb*, 942 F.3d at 323.

      a. Idemia did not have a "reasonable reliance on the particularized facts that were before it at the time the decision was made."

Here, Idemia offered no "particularized facts" that were before it when it made the decision to terminate Carroll. There was **no** documentation of performance concerns, nor was Carroll told his job was in jeopardy prior to termination. Carroll Dep., RE 78-1, Page ID # 1203, 1246; Casey Dep., RE 78-4, Page ID # 1347-1348. *See* Gregory Dep., RE 78-5, Page ID # 1374. *See* Dep. Ex. 35, sealed RE 80-22, p. 1504; Dep. Ex. 36, sealed RE 80-23, p. 2393. To the contrary, other executives found that Carroll's numbers and business plan was solid. Kallelis Dep., sealed RE 80-2, pp. 17-20, 48. *See* Carroll Dep., RE 78-1, Page ID # 1205; Brown Dep., RE 78-3, Page ID # 1297. Additionally, in September 2019, Casey

45

was bragging to Carroll that they were going to "drive change" insofar as it concerned Digital Labs' involvement in the TF project. Dep. Ex. 26, sealed RE 80-13, p. 480. These comments do not indicate that Carroll's performance was the problem, which undermines Idemia's position at summary judgment. Which follows the premise that "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. at 147 (citing *Wright* v. *West,* 505 U.S. 277, 296, 120 L. Ed. 2d 225, 112 S. Ct. 2482 (1992)) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'"). As such, Idemia failed to carry its burden that it had "particularized facts" before it when it made the decision to terminate Carroll.

> b. Idemia did not make a "reasonably informed and considered" decision in taking adverse action against Carroll which should have placed it outside the honest belief analysis.

Carroll does not dispute he was responsible for TF, nor that it was not making progress, nor meeting Idemia's inflated revenue projections. His factual statement was replete with instances where he was complaining about Idemia's lack of support for that program and its insistence he use Digital Labs which significantly hampered his ability to move it forward. However, like *Babb*, it makes no sense that it was reasonable for Carroll to have turned around that program in a mere three months' time, July to late October, the timeframe after Carroll started having dedicated staff and was focusing exclusively on that role, or that Idemia even had that expectation. Additionally, "that a *reasonable* [employer] would have *actually relied on those facts* to fire an experienced [employee]" like Carroll serves no logical basis, particularly when it just hired him to work in that position. *Babb*, 942 F.3d at 323. Only by narrowly pigeon-holing this case as entirely "a 'bare assertion' that the *facts* the employer relied on in firing them were wrong or overstated," can it be boxed in as an "honest-belief" which was an error. *Id*.

Carroll asserts that Idemia's proffered reason did not actually motivate the decision and was unreasonable in light of the facts, *i.e.*, that

47

Idemia knew all along revenue projections were dependent on technology, namely, Digital Labs, and no one, not even Casey could light a fire under Digital Labs and internally it appears that unbeknownst even to Casey, that Digital Labs was not prioritizing TF. Carroll Dep., RE 78-1, Page ID # 1210-1212, 1216, 1246; MSJ Ex. 3, sealed RE 80-34, pp. 1841-1843 (TF Roadmap); Dep. Ex. 41, sealed RE 80-26, pp. 2096-2097; Dep. Ex. 42, sealed RE 80-27, p. 2425-2428; Dep. Ex. 43, sealed RE 80-28, pp. 3290-3293; Casey Dep., RE 78-4, Page ID # 1343-1345; MSJ Ex. 9, sealed RE 80-39, pp. 1897, 1899, 1922, 1928 (excerpts). Thus, the honest belief doctrine does not apply. Moreover, the projections regarding revenue that are being blamed on Carroll were just that: projections, they were numbers that Idemia, not necessarily Carroll, was creating, to boost Idemia's VCP and its attempt to go public, and any projection was premised entirely on having the technology in place. Carroll Dep., RE 78-1, Page ID # 1211.

Taking away the *post hoc* finger pointing Idemia relies on, a reasonable fact finder could find that all the intertwined discussions about Carroll's health, his demotion and re-categorization to one business unit, TF, was a planned demise long before October 2019. Carroll Dep.,

48

RE 78-1, Page ID # 1245. *Amos v. McNairy Cnty.*, 622 F. App'x 529, 540 (6th Cir. 2015) (any justification made after the fact "can create a genuine dispute of material fact on the issue of pretext."); *see also Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009) ("We have held that when an employer . . . waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee, the employer's actions constitute the very definition of pretext."). To draw such a conclusion, a jury need only look at Casey's March 2019 text that Carroll had too much on his plate "*not to mention your upcoming trip to Germany and everything related to that*" where he informed Carroll he was going to start giving some of his work to Scott. Carroll Dep., RE 78-1, Page ID # 1218; Dep. Ex. 26, sealed RE 80-13, p. 496. And then, the subsequent correspondence from Delabriere to Casey, in April 2019, and their discussions that it was "critical that he remains on board [through December 2020] for passing on to Donnie and even more important to Pierre the key contacts with the clients and support his transition with the clients." Dep. Ex. 31, sealed RE 80-18, p. 6632. It defies logic that if Casey had a longstanding skepticism, that it was just uncovered in September 2019, when Mallen

49

and new hire Amlani, none of whom were intimately involved in TF, came to Nashville, but which coincidentally came on the heels of Carroll's increased health related disclosures, treatments, doctor's appointments and requests to attend meetings remotely. Dep. Ex. 23, sealed RE 80-10, p. 1726; Dep. Ex. 26, sealed RE 80-13, pp. 458-459, 462, 485-486; Dep. Ex. 24, sealed RE 80-21, p. 4641; Casey Dep., RE 78-4, Page ID # 1318; *see* Carroll Dep., RE 78-1, Page ID # 1246. To be sure, a reasonable jury could determine there was no honest belief that there was a "loss of confidence due to Carroll's failure to produce revenue for Trusted Fan, his continued advocating of an unviable business model, his failure to develop a business plan, and his false and misleading business plan" when it was never contemplated there would be revenue in 2019 and it was based entirely on the assumption Digital Labs would have a product ready for the 2019 NFL season; and, that unsurprisingly, when Digital Labs' did not meet its obligations, Carroll was terminated before the season was fully underway. MSJ Memo., RE 57, Page ID # 574; Dep. Ex. 5, RE 78-9, Page ID # 1459; MSJ Ex. 9, sealed RE 80-39, pp. 1882-1937[8]

---

[8] The slides from the May 2019 "VCP Refresh" was attended by Casey, not Carroll.

(excerpts highlighted). Thus, Idemia has failed to meet its burden as the moving party that no reasonable jury could find Carroll was discriminated against on the basis of his disability and age.

iii. The Inquiries and Statements About Carroll's Disability Made By Casey Were Not Consistent With Business Necessity

To justify discounting Casey's repeated discussions Carroll about his health, the District Court couched Casey's inquiries about Carroll's health as job-related and consistent with business necessity. Memo. Opinion, RE 92, Page ID # 1905. However, the standards cited by the District Court are inapposite.

The ADA states "[a] covered entity shall not … make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A) (1991).

Further, the employer bears the burden to demonstrate that such an inquiry is necessary if "(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or

others." *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007). Any such inquiry must be based on a "reasonable belief" based on objective evidence that (1) an employees' ability to perform essential functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition." Idemia did not demonstrate it had an objectively "reasonable belief" its inquiry was necessary. *Bates v. Dura Auto Sys., Inc.*, 767 F.3d 566, 581 (6th Cir. 2014). However, even under the loosest reading that Carroll's request for a flexible schedule and to work from home were requests for accommodation, Casey's inquiries and actions in removing Carroll from his job duties went too far, as did the District Court's broad determination Casey's inquiries were justified. This position is supported by EEOC Guidance:

> Example C: Six months ago, a supervisor heard a secretary tell her co-worker that she discovered a lump in her breast and is afraid that she may have breast cancer. Since that conversation, the secretary still comes to work every day and performs her duties in her normal efficient manner.
>
> In this case, the employer does not have a reasonable belief, based on objective evidence, either that the secretary's ability to perform her essential job functions will be impaired by a medical condition or that she will pose a direct threat due to a medical condition. The employer, therefore, may not make

> any disability-related inquiries or require the employee to
> submit to a medical examination.

EEOC Enforcement Guidance on Disability – Related Inquiries and Medical Examinations of Employees Under the ADA. https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees#4. As suggested by the guidance, Idemia had no reasonable belief Carroll's performance would be impaired by his disability. As such, the District Court's characterization of Casey's inquiries as justified was erroneous.

### C. The District Court Incorrectly Concluded There Were Issues of Performance Justifying Breach of Its Contract with Carroll

"The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005). In Tennessee, "parties to a contract owe each other a duty of good faith and fair dealing as it pertains to the performance of a contract." *Barnes v. Robinson Co. v. OneSource Facility Servs. Inc.*, 195 S.W.3d 637, 642 (Tenn.Ct.App. 2006). The purpose of the duty is to "honor[] the contracting parties' reasonable expectations" and

"protect[] the rights of the parties to receive the benefits" they bargained for. *Id*. "[I]n determining whether the parties acted in good faith in the performance of a contract, the court must judge the performance against the intent of the parties as determined by a reasonable and fair construction of the language of the instrument." *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996).

The District Court determined that because "no reasonable juror could conclude that Carroll was dismissed for any reason other than performance" because the product he was in charge of failed, he would not be entitled to payment under his contract. Memo. Opinion, RE 92, Page ID # 1907-1908.

When Carroll was terminated, Casey told Carroll they were "going in a different direction." Carroll Dep., RE 78-1, Page ID # 1249. Casey has no basis to dispute Carroll's recollection because he "does not recall" the specific conversation or the precise words, remarkably HR Gregory had the same inability to recall the reasons for Carroll's termination. Casey Dep., RE 78-4, Page ID # 1339; Gregory Dep., RE 78-5, Page ID # 1363-1364. After, not before, his termination, Idemia began taking steps to justify its breach its contract, even though the breach occurred on

54

November 6, not when they engaged in an "investigation" they have kept hidden from discovery. Resp. to Interrogatory, RE 56-5, Page ID# 457-458, 460; Crawley Dep., RE 78-6, Page ID # 1383-1384 (corporate representative testified she did not know of any documents that supported allegation of improper expenses); Dep. Ex. 8, RE 78-10, Page ID # 1470; Kallelis Dep., sealed RE 80-2, pp. 38-40; Dep. Ex. 52, RE 78-16, Page ID # 1508-1526; Dep. Ex. 4, RE 78-8, Page ID # 1400-1402. Pursuant to Carroll's contract, in the event he was terminated he was to be paid the following: 26 weeks of salary, including COBRA. Dep. Ex. 4, RE 78-8, Page ID # p. 1401. Based on Casey's statement, Carroll should have been eligible, as there was no mention that performance issues were present, much less that it would preclude payment owed pursuant to his employment contract. Carroll Dep., RE 78-1, Page ID # 1249; Casey Dep., RE 78-4, Page ID # 1339; Gregory Dep., RE 78-5, Page ID # 1363-1364. In fact, when Carroll and the rest of the company was notified, there was no mention of misconduct or performance. Dep. Ex. 35, sealed RE 80-22,

p. 1504; Dep Ex. 36, sealed RE 80-23, p. 2393. Thus, a reasonable jury could determine that Idemia breached its contract with Carroll.

## **CONCLUSION**

Accordingly, because the totality of evidence supports that dismissal on Summary Judgment was unwarranted, the district court's judgment should be reversed and this case should be remanded and tried by a jury.

Respectfully submitted,

/s/Heather Moore Collins
Heather Moore Collins
Ashley Shoemaker Walter
HMC CIVIL RIGHTS LAW, PLLC
7000 Executive Centre Dr,
Suite 320
Brentwood, TN 37027
(615) 724-1996
heather@hmccivilrights.com
ashley@hmccivilrights.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i) because the brief contains 11,733 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and this Court's Rule 32(b)(1).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.


Date: May 7, 2024                              s/Heather Moore Collins
                                               Heather Moore Collins

ADDENDUM

DESIGNATION OF RELEVANT
DISTRICT COURT DOCUMENTS

| RE No. | Description of Document | Page ID # |
|---|---|---|
| 1 | Complaint | 1-28 |
| 56 | Idemia's Motion For Summary Judgment | 243-247 |
| 56-5 | Deposition Exhibit 63 | 447-484 |
| 57 | Memorandum in Support of MSJ | 551-588 |
| 58 | Statement Of Facts | 589-648 |
| 76 | Carroll's Opp. To MSJ | 1053-1085 |
| 77 | Carroll's Response to Defendant's Statement of Facts and Additional Statement of Facts | 1086-1184 |
| 78-1 | 1/27/23 Deposition of Charles Carroll | 1188-1267 |
| 78-2 | 2/1/23 Deposition of Donald Scott, Jr. | 1268-1285 |
| 78-3 | 2/2/23 Deposition of Christopher Brown | 1286-1300 |
| 78-4 | 2/6/23 Deposition of Edward Casey | 1301-1349 |

| 78-5 | 2/7/23 Deposition of Karen Gregory | 1350-1378 |
|------|------------------------------------|-----------|
| 78-6 | 7/27/23 Deposition of Krista Crawley | 1379-1394 |
| 78-7 | 8/28/23 Deposition of Robert A. Lawson | 1395-1399 |
| 78-8 | Deposition Exhibit 4 | 1400-1402 |
| 78-9 | Deposition Exhibit 5 | 1403-1467 |
| 78-10 | Deposition Exhibit 8 | 1468-1470 |
| 78-11 | Deposition Exhibit 9 | 1471-1473 |
| 78-13 | Deposition Exhibit 15 | 1502 |
| 78-14 | Deposition Exhibit 16 | 1503 |
| 78-15 | Deposition Exhibit 44 | 1504-1507 |
| 78-16 | Deposition Exhibit 52 | 1508-1526 |
| 80 | Notice of Filing Sealed Exhibits | n/a |
| 80-2 | [Sealed] 7/25/23 Attorneys Eyes Only Portion of Deposition of Dennis Kallelis | n/a |
| 80-3 | [Sealed] Deposition Exhibit 14 | n/a |

| 80-4 | [Sealed] Deposition Exhibit 17 | n/a |
|---|---|---|
| 80-5 | [Sealed] Deposition Exhibit 18 | n/a |
| 80-6 | [Sealed] Deposition Exhibit 19 | n/a |
| 80-7 | [Sealed] Deposition Exhibit 20 | n/a |
| 80-8 | [Sealed] Deposition Exhibit 21 | n/a |
| 80-9 | [Sealed] Deposition Exhibit 22 | n/a |
| 80-10 | [Sealed] Deposition Exhibit 23 | n/a |
| 80-11 | [Sealed] Deposition Exhibit 24 | n/a |
| 80-12 | [Sealed] Deposition Exhibit 25 | n/a |
| 80-13 | [Sealed] Deposition Exhibit 26 | n/a |
| 80-14 | [Sealed] Deposition Exhibit 27 | n/a |
| 80-15 | [Sealed] Deposition Exhibit 28 | n/a |
| 80-16 | [Sealed] Deposition Exhibit 29 | n/a |
| 80-17 | [Sealed] Deposition Exhibit 30 | n/a |

| 80-18 | [Sealed] Deposition Exhibit 31 | n/a |
|-------|-------------------------------|-----|
| 80-19 | [Sealed] Deposition Exhibit 32 | n/a |
| 80-20 | [Sealed] Deposition Exhibit 33 | n/a |
| 80-21 | [Sealed] Deposition Exhibit 34 | n/a |
| 80-22 | [Sealed] Deposition Exhibit 35 | n/a |
| 80-23 | [Sealed] Deposition Exhibit 36 | n/a |
| 80-24 | [Sealed] Deposition Exhibit 37 | n/a |
| 80-25 | [Sealed] Deposition Exhibit 38 | n/a |
| 80-26 | [Sealed] Deposition Exhibit 41 | n/a |
| 80-27 | [Sealed] Deposition Exhibit 42 | n/a |
| 80-28 | [Sealed] Deposition Exhibit 43 | n/a |
| 80-29 | [Sealed] Deposition Exhibit 48 | n/a |
| 80-30 | [Sealed] Deposition Exhibit 49 | n/a |
| 80-31 | [Sealed] Deposition Exhibit 51 | n/a |

| 80-32 | [Sealed] MSJ Exhibit 1 | n/a |
| 80-33 | [Sealed] MSJ Exhibit 2 | n/a |
| 80-34 | [Sealed] MSJ Exhibit 3 | n/a |
| 80-35 | [Sealed] MSJ Exhibit 4 | n/a |
| 80-36 | [Sealed] MSJ Exhibit 5 | n/a |
| 80-37 | [Sealed] MSJ Exhibit 6 | n/a |
| 80-38 | [Sealed] MSJ Exhibit 7 | n/a |
| 80-39 | [Sealed] MSJ Exhibit 9 | n/a |
| 90 | Defendant's Response to Plaintiff's Additional Statement of Facts | 1833-1862 |
| 91 | Defendant's Reply to Plaintiff's Opposition to Summary Judgment | 1863-1874 |
| 92 | Judgment Memo. Opinion | 1875-1908 |
| 93 | Order | 1909 |
| 94 | Judgment | 1910 |

| 96 | Notice of Appeal | 1926-1927 |
|----|------------------|-----------|

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 7, 2024, I caused the foregoing brief and addendum to be filed electronically with the Court, where they are available for viewing and downloading from the Court's ECF system, and that such electronic filing automatically generates a Notice of Electronic Filing constituting service. I certify that all parties required to be served have been served.

<u>s/Heather Moore Collins</u>
Heather Moore Collins