**No. 23-6075**

---

## UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CHARLES CARROLL,

*Plaintiff-Appellant*

*v.*

IDEMIA IDENTITY AND SECURITY USA, LLC,

*Defendant-Appellee*

On Appeal from the United States District Court for the
Middle District of Tennessee
The Honorable Aleta A. Trauger

District Court Case No. 3:21-CV-00800

---

**APPELLEE'S BRIEF**

---

Jeremy D. Sosna
jsosna@littler.com
Claire E. Welch
cwelch@littler.com
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402.2136
Telephone: 612.630.1000
Facsimile:  612.630.9626

**Attorneys for Defendant-Appellee**

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellee Idemia Identity & Security USA, LLC is a Delaware limited liability company. Its parent company and sole member is Morpho USA, Inc., a Delaware corporation. Idemia Identity & Security USA, LLC states that no publicly held corporation owns any part of its stock.

# TABLE OF CONTENTS

PAGE

CORPORATE DISCLOSURE STATEMENT ........................................................1

STATEMENT REGARDING ORAL ARGUMENT .............................................1

STATEMENT OF THE UNDISPUTED MATERIAL FACTS ............................2

I.  THE PARTIES .........................................................................................2

II.  IDEMIA'S ADMINISTRATION OF THE TSA PRECHECK
PROGRAM..............................................................................................3

III.  CARROLL CREATES THE TRUSTED FAN CONCEPT, WHICH
BECOMES ONE OF THE CENTERPIECES OF IDEMIA'S
GROWTH STRATEGY.............................................................................4

IV.  ED CASEY BECOMES CEO AND MAKES CLEAR HIS
INTENTION TO REPLACE THE LEADERSHIP TEAM..........................6

V.  THROUGHOUT 2018, CASEY EXPRESSES CONCERNS WITH
BOTH THE TRUSTED FAN BUSINESS MODEL AND
CARROLL'S LEADERSHIP.....................................................................7

VI.  CASEY AND IDEMIA DECIDE TO MAKE TRUSTED FAN ITS
OWN BUSINESS UNIT, SEPARATE FROM ENROLLMENT
SERVICES ...........................................................................................11

VII.  IDEMIA PROMOTES CARROLL TO FOCUS SOLELY ON
TRUSTED FAN DUE TO THE IMPORTANCE OF THE BUSINESS
TO IDEMIA'S FUTURE .......................................................................12

VIII.  CARROLL TRAVELS TO GERMANY FOR CANCER
TREATMENT ......................................................................................15

IX.  IDEMIA ANNOUNCES CARROLL'S PROMOTION
INTERNALLY .....................................................................................17

X.  CASEY CONTINUES TO HAVE SIGNIFICANT CONCERNS
WITH CARROLL'S PROGRESS AND LEADERSHIP OF
TRUSTED FAN ....................................................................................18

# TABLE OF CONTENTS
(CONTINUED)

PAGE

XI.   CASEY ORDERS A REVIEW OF CARROLL'S BUSINESS
      MODEL ...................................................................................20

XII.  CASEY VISITS CARROLL'S OFFICES AND CONFIRMS
      TRUSTED FAN IS NOT VIABLE...............................................22

XIII. IDEMIA TERMINATES CARROLL'S EMPLOYMENT ........................24

XIV.  PROCEDURAL HISTORY .......................................................26

SUMMARY OF THE ARGUMENT ....................................................27

LEGAL ARGUMENT......................................................................29

I.    STANDARD OF REVIEW...........................................................29

II.   THE DISTRICT COURT CORRECTLY GRANTED IDEMIA'S
      MOTION FOR SUMMARY JUDGMENT AS TO CARROLL'S
      CLAIMS OF DISABILITY AND AGE DISCRIMINATION. ...................31

      A.   IDEMIA Plainly Met Its Burden of Proffering a Legitimate,
           Non-Discriminatory Reason for Terminating Carroll's
           Employment. ......................................................................32

      B.   Carroll Cannot Show IDEMIA's Legitimate Non-
           Discriminatory Reasons For His Termination Were A Pretext
           For Disability Discrimination..............................................35

           1.   Summary judgment was proper because Carroll did not
                present any evidence that the reasons given by IDEMIA
                are pretextual.............................................................36

           2.   Carroll's purported evidence of disability discrimination
                is insufficient to prove pretext. ....................................39

           3.   Carroll's other arguments in support of pretext are
                unavailing as a matter of law. ......................................43

           4.   The district court properly analyzed pretext and applied
                the "honest belief" rule. .............................................46

ii.

# TABLE OF CONTENTS
(CONTINUED)

      C.      Carroll Cannot Show Pretext As To His ADEA Claim. ....................49

III.    CARROLL'S COMMON LAW BREACH OF CONTRACT CLAIM FAILS. ....................................................................................................54

CONCLUSION ..........................................................................................................57

CERTIFICATE OF COMPLIANCE .......................................................................58

CERTIFICATE OF SERVICE ................................................................................60

# TABLE OF AUTHORITIES

PAGE

**Cases**

*Alberty v. Columbus Twp.*,
    730 Fed. App'x. 352 (6th Cir. 2018) ...................................................50

*Alvarez v. Des Moines Bolt Supply Inc.*,
    626 F. 3d 410 (8th Cir. 2010) ...........................................................38

*Anderson v. Liberty Lobby, Inc*,
    477 U.S. 242 (1986)...........................................................................31

*Babb v. Maryville Anesthesiologists P.C.*,
    942 F.3d 308 (6th Cir. 2019) ......................................................47, 49

*Bender v. Hecht's Dep't Stores*,
    455 F.3d 612 (6th Cir. 2006) ............................................................46

*Blazek v. City of Lakewood, Ohio*,
    576 F. App'x 512 (6th Cir. 2014) .....................................................31

*Blizzard v. Marion Tech. Coll.*,
    698 F.3d 275 (6th Cir. 2012) ..............................................36, 38, 47

*Bowie v. Advanced Ceramics Corp.*,
    72 F. App'x 258 (6th Cir. 2003)........................................................34

*Braithwaite v. Timken Co.*,
    258 F.3d 488 (6th Cir. 2001) ............................................................54

*Briggs v. Univ. of Cincinnati*,
    11 F.4th 498 (6th Cir. 2021) .......................................................30, 32

*BSG, LLC v. Check Velocity, Inc.*,
    395 S.W.3d 90 (Tenn. 2012) ........................................................55, 56

*Buhrmaster v. Overnite Transp. Co.*,
    61 F. 3d 461 (6th Cir. 1995) ............................................................53

*Carter v. Toyota Tsusho Am., Inc.*,
  529 F. App'x 601 (6th Cir. 2013)..................................................*passim*

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..........................................................30

*Chen v. Dow Chem. Co.*,
  580 F.3d 394 (6th Cir. 2009) ...............................................36

*Cicero v. Borg-Warner Automotive, Inc.*,
  280 F.3d 579 (6th Cir. 2002) ..............................................34

*Clay v. United Parcel Serv., Inc.*,
  501 F.3d 695 (6th Cir. 2007) .........................................33, 34

*EEOC v. Prevo's Fam. Mkt., Inc.*,
  135 F.3d 1089 (6th Cir. 1998) ............................................40

*Ferrari v. Ford Motor Co.*,
  826 F.3d 885 (6th Cir. 2016) ..............................................38

*Garrett v. Sw. Med. Clinic*,
  631 Fed. App'x 351 (6th Cir. 2015)....................................53

*Gregg v. Allen-Bradley Co.*,
  801 F.2d 859 (6th Cir. 1986) ..............................................30

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 ...................................................................50

*Hardesty v. Kroger Co.*,
  758 F. App'x 490 (6th Cir. 2019)....................................36, 38

*Hazen Paper Co. v. Biggins*,
  507 U.S. 604 (1993)..........................................................52

*Howley v. Fed. Express Corp.*,
  682 F. App'x 439 (6th Cir. 2017)....................................34, 35

*Idemudia v. J.P. Morgan Chase*,
  434 F. App'x 495 (6th Cir. 2011).........................................34

*Ingram v. Cendant Mobility Fin. Corp.*,
215 S.W.3d 367 (Tenn. Ct. App. 2006)..............................................................54

*Jones v. Potter*,
488 F.3d 397 (6th Cir. 2007) ...............................................................34

*Lansing Dairy, Inc. v. Espy*,
39 F.3d 1339 (6th Cir. 1994), *cert. denied*, 516 U.S. 806 (1995) .....................30

*Manzer v. Diamond Shamrock Chems. Co.*,
29 F.3d 1078 (6th Cir. 1994) ...............................................................43

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...............................................................30

*McGee v. Best*,
106 S.W.3d 48 (Tenn. Ct. App. 2002)..............................................................56

*Miles v. S. Cent. Human Res. Agency, Inc.*,
946 F.3d 883 (6th Cir. 2020) ...............................................................35, 46

*Mitchell v. Toledo Hosp.*,
964 F.2d 577 (6th Cir. 1992) ...............................................................30

*Parkhurst v. American Healthways Services, LLC*,
2106 WL 4591630 (M.D. Tenn. 2016 ...............................................................41

*Parks v. UPS Supply Chain Solutions, Inc.*,
607 F. App'x 508 (6th Cir. 2015) ...............................................................46

*Pelcha v. MW Bancorp, Inc.*,
988 F.3d 318 ...............................................................46, 52

*Pierson v. Quad/Graphics Printing Corp.*,
749 F.3d 530, 536 (6th Cir. 2014) ...............................................................31

*Rogers v. Henry Ford Health Sys.*,
897 F.3d 763 (6th Cir. 2018) ...............................................................32

*Rosenthal v. Faygo Beverages, Inc.*,
701 F. App'x 472 (6th Cir. 2017)...............................................................34

*Scheick v. Tecumseh Public Schools*,
766 F.3d 523 (6th Cir. 2014) ...................................................................50

*Schoonmaker v. Spartan Graphics*,
595 F.3d 261 (6th Cir. 2010) ...................................................................50

*Seeger v. Cincinnati Bell Tel. Co.*,
681 F.3d 274 (6th Cir. 2012) ...................................................................47

*Skelton v. Sara Lee Corp.*,
249 Fed. App'x. 450 (6th Cir. 2007) .......................................................51

*Smith v. Chrysler Corp.*,
155 F.3d 799 (6th Cir. 1998) ...................................................................48

*Smith v. City of Toledo*,
13 F.4th 508 (6th Cir. 2021) ....................................................................30

*Thorpe v. Alber's, Inc.*,
922 F. Supp. 84 (E.D. Tenn. 1996)..........................................................41

*Trapp v. TSS Techs., Inc.*,
485 F. App'x 757 (6th Cir. 2012)........................................................51, 52

*Wexler v. White's Furniture, Inc.*,
317 F.3d 564 (6th Cir. 2003) (en banc) ..................................................53

*White v. Baxter Healthcare Corp.*,
533 F.3d 381 (6th Cir. 2008) ...................................................................35

*White v. Columbus Metro. Hous. Auth.*,
429 F.3d 232 (6th Cir. 2005) ...................................................................31

*Woythal v. Tex-Tenn Corp.*,
112 F.3d 243 (6th Cir. 1997) ...................................................................52

**Statutes**

42 U.S.C. § 12112(d)(4) .....................................................................40, 41

**Other Authorities**

29 C.F.R. § 1630.14(c)...............................................................................40

Fed. R. Civ. P. 56 ...................................................................................30

Germany. Statement of Undisputed Facts, RE 77 ...................................45

Memorandum in Support of Motion for Summary Judgment, RE 57....................32

## **STATEMENT REGARDING ORAL ARGUMENT**

Appellee Idemia Identity & Security USA, LLC respectfully submits that oral argument is not warranted in this straightforward employment discrimination case, which neither presents complex facts or unique issues of law. The district court properly granted summary judgment because the undisputed factual record demonstrates that Appellant Charles Carroll cannot prove any of his claims as a matter of law.

## STATEMENT OF THE UNDISPUTED MATERIAL FACTS

### I.    THE PARTIES

Idemia Identity and Security USA LLC ("IDEMIA") is a worldwide leader in biometric identification and security.[1] Statement of Undisputed Facts ("SOF"), RE 77, Page ID # 1086. Among other identity and security solutions in its portfolio of products and services, IDEMIA contracts with state and federal government agencies to provide identity technology platforms to authenticate the identities of individuals who are seeking to access certain services (such as drivers' licenses) using government-grade biometric technologies, including fingerprint, facial, and iris recognition technologies. SOF, RE 77, Page ID # 1087. Over 600 state and federal governments across the globe rely on IDEMIA's solutions to verify identities of citizens and travelers. *Id*.

Charles Carroll ("Carroll") founded Integrated Biometric Technology ("IBT") in approximately 2000, which, after his sale of IBT and rebranding, became IDEMIA in 2017. SOF, RE 77, Page ID # 1087-1088. In 2017, Carroll was named Senior Vice President of Enrollment Services. SOF, RE 77, Page ID # 1088. In this role, Carroll led the business division within IDEMIA that was responsible for overseeing the Universal Enrollment Services ("UES") contract

---

[1] IDEMIA is a subsidiary of IDEMIA Group (the "Group") based in Paris, France. RE 77, Page ID # 1086.

with the federal government, which included executive responsibility for overseeing the Transportation Security Administration's Pre-Check program ("PreCheck"). SOF, RE 77, Page ID # 1088. Carroll held this position until his promotion to Senior Vice President of Citizen Services in July 2019. SOF, RE 77, Page ID # 1088-1089. Carroll was a member of the Executive Committee (the "ExComm") and reported directly to Ed Casey ("Casey"), IDEMIA's CEO, from 2018 until his termination in 2019. SOF, RE 77, Page ID # 1089.

## II.   IDEMIA'S ADMINISTRATION OF THE TSA PRECHECK PROGRAM

IDEMIA contracts with the U.S government to provide certain identity and security services to the traveling public. SOF, RE 77, Page ID # 1089. Under the UES contract and the 2019 successor contract ("UES2")[2], IDEMIA is exclusively responsible for operating Enrollment Centers where members of the traveling public can apply to enroll in PreCheck and get fingerprinted as part of the necessary background check. SOF, RE 77, Page ID # 1089. A traveler who applies and is approved for enrollment in the PreCheck program is allowed to use the faster PreCheck security lanes at designated U.S. airports. SOF, RE 77, Page ID #

---

[2] In 2018, TSA notified IDEMIA that TSA intended to solicit proposals for administration of the PreCheck program, meaning that IDEMIA was required to compete with other companies for the renewal of the UES contract. RE 77, Page ID # 1090. TSA ultimately renewed its contract (the "UES2" contract) with IDEMIA to continue administering the Precheck program in 2019. *Id.*

1090. In effect, PreCheck is a "fast pass" for the traveling public to bypass the normal (often longer) security lines. SOF, RE 77, Page ID # 1090. Prior to June 2019, the PreCheck program and some (but not all) of the state and federal governmental identification verification programs administered by IDEMIA were part of the Enrollment Services business division for which Carroll was responsible as Vice President of Enrollment Services. SOF, RE 77, Page ID # 1091-1092. The Enrollment Services division was based in Franklin, Tennessee. SOF, RE 77, Page ID # 1092.

## III.   CARROLL CREATES THE TRUSTED FAN CONCEPT, WHICH BECOMES ONE OF THE CENTERPIECES OF IDEMIA'S GROWTH STRATEGY

In or about 2017, Carroll conceived of a new concept called Trusted Fan. SOF, RE 77, Page ID # 1103. Trusted Fan was a service innovation (and new revenue stream) which would build on IDEMIA's experience with PreCheck. SOF, RE 77, Page ID # 1103-1104. Trusted Fan would theoretically use biometric identity services to offer a similar "fast pass" experience for patrons entering sports stadiums, arenas, and concert venues. SOF, RE 77, Page ID # 1103-1104. The initial business concept was relatively simple: an enrollee would have their biometric information tied to a form of payment (or the ticketing system) so that the individual could simply wave their hand at a sensor for entry to an event (using

"wave" technology IDEMIA was developing), to buy merchandise, or to pay for food and beverages. SOF, RE 77, Page ID # 1104. Ultimately, the wave technology, which was still under development was not feasible because it would not work in sunlight at stadiums/venues. SOF, RE 77, Page ID # 1105. As discussed below, one of the fundamental flaws with Carroll's Trusted Fan business model is that he never developed a cohesive and scalable digital strategy for Trusted Fan after it was determined the wave technology was not workable. SOF, RE 77, Page ID # 1104-1105.

The importance of Trusted Fan to IDEMIA cannot be overstated. When Carroll first presented the embryonic idea in 2017, IDEMIA was heavily focused on developing new revenue streams to grow the company using its biometric technology with non-governmental customers (such as financial institutions, private companies that required security systems, and consumers). SOF, RE 77, Page ID # 1106. IDEMIA was excited about Trusted Fan because it offered the opportunity to shift from government customers (such as TSA) to private businesses and consumers. SOF, RE 77, Page ID # 1106. Trusted Fan was considered one of the most promising new business opportunities because it aligned with IDEMIA's strategy of diversifying its sources of revenue from primarily government customers to one that included non-government customers.

5

SOF, RE 77, Page ID # 1106, 1108. Based on Carroll's projection of *substantial* revenue and the potential to break into new, non-governmental markets, IDEMIA included Trusted Fan as a key business in its growth-focused Value Creation Plan[3] ("VCP") as one of the primary growth opportunities for the IDEMIA. SOF, RE 77, Page ID # 1106-1107. Both Bob Eckels (the CEO of IDEMIA at the time) and members of the Group's leadership in Paris were initially enthusiastic about the Trusted Fan concept because it created a new market and, if successful, presented a chance to significantly grow revenue. SOF, RE 77, Page ID # 1108. Thus, IDEMIA tasked Carroll with developing the concept and committed significant time and money to ensure that Carroll had the resources he needed to successfully take Trusted Fan from a concept to an operating business that actually generated revenue. SOF, RE 77, Page ID # 1108-1109.

## IV.   ED CASEY BECOMES CEO AND MAKES CLEAR HIS INTENTION TO REPLACE THE LEADERSHIP TEAM

In January of 2018, IDEMIA appointed Ed Casey as CEO, replacing Eckels. SOF, RE 77, Page ID # 1109. Casey made clear immediately that he intended to

---

[3] The VCP was the structure within which IDEMIA identified new business lines to create new revenue streams, operationalize those new revenue streams, forecast the timing and revenue from such new business lines, and report progress to the Group; the VCP was intended to grow IDEMIA's revenue without relying solely on the existing "base" revenue governmental businesses, such as the original UES Contract and the PreCheck program. RE 77, Page ID # 1107.

replace the management team at IDEMIA with his own management team. SOF, RE 77, Page ID # 1110-1111. Casey announced on his second day as CEO in February of 2018 at an all-hands employee meeting that he planned to replace every member of the ExComm. SOF, RE 77, Page ID # 1110-1111. In fact, during Casey's tenure as CEO, Casey replaced every leader of a business unit on the ExComm and all but one of the leaders of administrative functions (such as legal and human resources). SOF, RE 77, Page ID # 1111.

Very early in Casey's tenure, Carroll volunteered to Casey that he had prostate cancer. SOF, RE 77, Page ID # 1109. In response, Casey shared with Carroll that he was very empathetic because his wife had nearly died after a long battle with cancer, and he encouraged Carroll to take any time he needed to care for his health. SOF, RE 77, Page ID # 1109 -1110. In other words, it is undisputed that Casey was aware of Carroll's cancer nearly two years before the termination of Carroll's employment.

## V.   THROUGHOUT 2018, CASEY EXPRESSES CONCERNS WITH BOTH THE TRUSTED FAN BUSINESS MODEL AND CARROLL'S LEADERSHIP

Casey quickly learned that Trusted Fan had been identified as one of the primary strategies for growing IDEMIA's revenue. SOF, RE 77, Page ID # 1111. However, Casey did not share Carroll's optimism for the business and was

7

skeptical of the lofty financial projections made by Carroll. SOF, RE 77, Page ID # 1111. As early as March 2018, Casey began expressing concerns with Carroll's Trusted Fan business model and questioned whether it was financially viable. SOF, RE 77, Page ID #1112-1113.

Carroll's Trusted Fan business model involved IDEMIA paying sports teams and venues significant marketing fees (millions of dollars each) in exchange for the right to advertise PreCheck, to have staff at events soliciting attendees to enroll in Trusted Fan, and to have access to season ticket holders to whom IDEMIA could market Trusted Fan directly. SOF, RE 77, Page ID # 1113-1114. Carroll's strategy was premised on the idea that the marketing agreements were just a foot in the door and would result in sufficient adoption rates of Trusted Fan by attendees to offset the significant up-front marketing fees that IDEMIA would need to pay for access to the attendees/fanbase at these events. SOF, RE 77, Page ID # 1119. Although he had no reliable data to support his basic plan assumptions (such as pricing and adoption rates), Carroll was confident that at some undefined point in the future, sports teams and venues would agree to give up the lucrative marketing/sponsorship agreements altogether and instead pay IDEMIA to provide attendees with access to Trusted Fan. SOF, RE 77, Page ID # 1114. Casey and IDEMIA leadership were highly skeptical that there was any incentive for the

sports teams and venues to give up these valuable marketing agreements (which provided millions of dollars in advertising revenue) and instead pay IDEMIA, meaning that the substantial front-end investment in marketing agreements for which Carroll advocated would not ultimately result in net-new revenue and profit growth for IDEMIA. SOF, RE 77, Page ID # 1115-1120. Notwithstanding the significant problems with the Trusted Fan business model and the lack of evidence that IDEMIA could generate net-positive revenue, Carroll continued to project that the business would generate millions and millions of dollars in revenue for IDEMIA in a very short period of time, including projections of $5 million in EBITDA in 2020 and $9 million in EBITDA in 2021. SOF, RE 77, Page ID # 1120-1121.

At the same time, Casey also had reservations with Carroll's leadership of Enrollment Services and the important PreCheck program. SOF, RE 77, Page ID # 1121. For example, shortly after he began as CEO, Casey was alarmed to learn that Carroll had not developed a strategy for the upcoming competitive renewal process for the UES contract with TSA (a significant source of IDEMIA's revenue) and did not even know when TSA (the biggest customer in Enrollment Services, the division Carroll led) intended to commence the process. SOF, RE 77, Page ID # 1121. Casey's concerns were heightened when, despite Carroll's assurances that

the commencement of the process was months away, TSA suddenly notified IDEMIA in March 2018 that it would have to compete with other companies for the renewal of the UES contract, meaning IDEMIA would have to quickly develop a strategy for maintaining this critical business and a significant source of IDEMIA's revenue. SOF, RE 77, Page ID # 1122. And when Carroll's team prepared IDEMIA's proposal, Casey learned from an outside (the Cherthoff Group) that Carroll's proposal had at least four material deficiencies that, if they had not been caught, would likely have resulted in IDEMIA being disqualified from winning the right to continue administering the lucrative PreCheck program. SOF, RE 77, Page ID # 1122-1123. Casey was losing confidence that Carroll was the right person to lead this critical business for IDEMIA. SOF, RE 77, Page ID # 1123-1125. However, when Casey indicated in Summer 2018 that he wanted to remove Carroll as leader of Enrollment Services, The Chertoff Group advised against doing so to avoid any perceived disruption during the competitive PreCheck renewal process. SOF, RE 77, Page ID # 1124-1125. The Group's leadership also told Casey it did not want to make a change while IDEMIA was competing for renewal of the UES contract. SOF, RE 77, Page ID # 1124-1125. Accordingly, Carroll remained in his role leading Enrollment Services despite

Casey's desire to make a change in leadership in mid-2018. SOF, RE 77, Page ID # 1125.

## VI.  CASEY AND IDEMIA DECIDE TO MAKE TRUSTED FAN ITS OWN BUSINESS UNIT, SEPARATE FROM ENROLLMENT SERVICES

Meanwhile, Casey began to formulate plans to separate Trusted Fan from Enrollment Services. SOF, RE 77, Page ID # 1125-1126. Given the importance of Trusted Fan to IDEMIA's growth strategy (for which Casey was ultimately responsible), Casey believed Trusted Fan needed dedicated leadership to focus on developing and operationalizing a viable business model. SOF, RE 77, Page ID # 1126. Casey also determined that PreCheck was too important to the Company to have a leader that had his attention divided between PreCheck and developing a new business, Trusted Fan. SOF, RE 77, Page ID # 1127.

There were also ample reasons to consolidate all the government-focused businesses under a single business leader, which would ensure consistency in operations and create a better model for customers. *Id.* For example, TSA was a customer of both the Enrollment Services business (led by Carroll) and the Public Services division (led by Donnie Scott, then the Vice President of Public Services). SOF, RE 77, Page ID # 1127. IDEMIA had received feedback from TSA that it did not always understand which business leader (Scott or Carroll) it should talk to or

why it needed to speak to two different leaders at IDEMIA. SOF, RE 77, Page ID # 1127.

In October 2018, the Group named Yann Delabriere ("Delabriere") as its new CEO (to whom Casey reported). SOF, RE 77, Page ID # 1128. Casey immediately advised Delabriere that he intended to move the Enrollment Services businesses (including PreCheck) from Carroll to be under Scott and the Public Services business division after the UES2 process had been completed. *Id.* Delabriere informed Casey that he fully agreed with this decision. *Id.*

## VII. IDEMIA PROMOTES CARROLL TO FOCUS SOLELY ON TRUSTED FAN DUE TO THE IMPORTANCE OF THE BUSINESS TO IDEMIA'S FUTURE

The UES2 contract was awarded to IDEMIA in January of 2019. SOF, RE 77, Page ID # 1128. Casey and Delabriere agreed it was time to inform Carroll of the decision to consolidate Enrollment Services with Public Services (the business led by Scott). *Id.* On April 22, 2019, Casey emailed Delabriere to advise him that he planned to meet with Carroll the following day to inform Carroll of the decision. SOF, RE 77, Page ID # 1129. Casey met with Carroll in person the next day to inform him and offered him a new position leading IDEMIA's corporate development function. SOF, RE 77, Page ID # 1129.

On April 25, 2019, Casey emailed Carroll the job description for the new role of Senior Vice President Corporate Development, which came with a significant increase in compensation. SOF, RE 77, Page ID # 1130. In the proposed new role, Carroll would be responsible for identifying, initiating, contacting, and formulating the commercial terms for new commercial contracts, as well as conceiving of and developing new market opportunities. SOF, RE 77, Page ID # 1130. Carroll would remain a member of the Executive Committee and would serve as the advisor to the new leaders of the combined Public Security/Enrollment Services business division and a new business called Citizen Services, which would oversee development and execution of the Trusted Fan business plan. *Id.* Casey believed the new role would best leverage Carroll's strengths. *Id*. Casey saw Carroll as a visionary who could conceive of new business ideas, but not a strong leader in executing a plan to take an unproven business concept to profitable, operating business. SOF, RE 77, Page ID # 1130-1131. Casey made clear this role was not an effort to put Carroll "out to pasture," but an important role, critical to IDEMIA's growth. SOF, RE 77, Page ID # 1131.

Carroll initially seemed interested in the new role. SOF, RE 77, Page ID # 1131. On May 5, 2019, Carroll emailed Casey about the new role, including a request for an increased base salary and bonus. SOF, RE 77, Page ID # 1132.

Despite making Carroll aware that he was already paid more than the other business leaders on the ExComm, Casey agreed he would support Carroll's requested increases and would lobby Delabriere to approve the higher compensation package. SOF, RE 77, Page ID # 1132. In fact, throughout the negotiation that ultimately led to Carroll's promotion to Senior Vice President of Citizen Services, each time Carroll requested more money, Casey advocated on Carroll's behalf to persuade Delabriere to give Carroll what he wanted to stay. SOF, RE 77, Page ID # 1132-1133.

After his initial email, Carroll expressed to Casey that he wanted to continue leading the development of Trusted Fan *and* keep the Enrollment Services division. SOF, RE 77, Page ID # 1133. Casey responded that IDEMIA planned to separate Enrollment Services and Trusted Fan because of Casey's firm belief that each business (especially the nascent Trusted Fan business) needed a dedicated leader to be successful. SOF, RE 77, Page ID # 1133. However, Casey told Carroll he could choose which business he wanted to run – Casey told Carroll that he would support Carroll leading either Trusted Fan or Enrollment Services, but not both. SOF, RE 77, Page ID # 1133. Several days later, Carroll confirmed to Casey that he wanted to "keep" Trusted Fan and to become the head of Citizen Services. SOF, RE 77, Page ID # 1134. Casey was entirely supportive because Carroll was

passionate about Trusted Fan, and Casey wanted to provide Carroll the opportunity to spend 100 percent of his time on the project to determine whether the initiative had merit, especially due to the lofty financial projections Carroll and his team were presenting. SOF, RE 77, Page ID # 1134.

On May 19, 2023, Carroll abruptly emailed Casey to inform him that Carroll had changed his mind and intended to resign. SOF, RE 77, Page ID # 1134. Instead of simply accepting Carroll's resignation, Casey made clear he wanted Carroll on his team and persuaded Carroll to remain with IDEMIA. *Id.* Casey then began two-months of negotiations with Carroll to ensure Carroll would accept the newly created SVP position and lead Trusted Fan. SOF, RE 77, Page ID # 1134.[4]

## VIII. CARROLL TRAVELS TO GERMANY FOR CANCER TREATMENT

In early June 2019, Carroll informed Casey that he intended to travel to Germany for treatment for prostate cancer. SOF, RE 77, Page ID # 1135. Casey repeatedly encouraged Carroll to take all the time he needed to care for his health. SOF, RE 77, Page ID # 1136. Carroll was in Germany from approximately June

---

[4] The negotiations between Carroll and IDEMIA were tense at times between May and July 25, 2019 (the date on which Carroll finally signed the Employment Agreement), largely because of Delabriere's frustration with Carroll's continued requests for more money and delay in committing to this new, important position. SOF, RE 77, Page ID # 1135. Yet Casey (the person Carroll now accuses of discriminating) continued to advocate to the Group to approve Carroll's compensation demands. SOF, RE 77, Page ID # 1135.

17, 2019, through June 31, 2019. *Id.* Carroll worked the entire time he was receiving treatment in Germany and claims to have even conducted business meetings with IDEMIA customers and prospective customers during this time. *Id.* It is undisputed that Carroll never asked IDEMIA for any accommodation during this period. SOF, RE 77, Page ID # 1136.

Carroll continued to communicate regularly with Casey during this time about both business and his treatments. SOF, RE 77, Page ID # 1137. In fact, on a number of occasions, it was Carroll who initiated conversations about his health and the status of his treatments with Casey. SOF, RE 77, Page ID # 1137. Casey was nothing but supportive of Carroll and told Carroll to do whatever was needed for his health, including by taking all the time he needed for treatment and recovery. SOF, RE 77, Page ID # 1137. Carroll never reported to Casey or anyone else at IDEMIA that he believed Casey's communications regarding his health were anything but genuine, that Casey was treating him differently because of his cancer, or that Casey did anything to suggest he was unhappy with Carroll due to the need for treatment. SOF, RE 77, Page ID # 1137. In fact, when he learned Carroll was in Germany alone, Casey offered to fly to Germany to travel back to the U.S. with Carroll, so Carroll did not have to be alone. SOF, RE 77, Page ID # 1138. The text messages between Carroll and Casey are replete with examples of

16

supportive messages from Casey to Carroll. SOF, RE 77, Page ID # 1138. Even a cursory review of the text messages shows that Carroll's current efforts to characterize Casey's communications as evidence of discriminatory animus are wholly unfounded.

## IX.   IDEMIA ANNOUNCES CARROLL'S PROMOTION INTERNALLY

After Carroll's return from Germany, Casey continued to negotiate with Carroll regarding the new SVP position leading Citizen Services and continued to express to Carroll that he wanted Carroll to accept the promotion. SOF, RE 77, Page ID # 1138-1139. Indeed, in the face of increasing frustration/anger from Delabriere with Carroll's attempts to negotiate for more money and his ongoing refusal to sign the new Employment Agreement (the "Agreement") offered by IDEMIA, Casey urged Carroll to accept, telling him "I think you know I want you to stay and have tried to make it attractive for you to stay. . . . I have been lobbying for you with Advent . . . . Make no mistake, we want you as a partner. . . . I want you to stay. I want you as a partner." SOF, RE 77, Page ID # 1138-1139. Between July 12 and July 25, 2019 (well after Carroll's return from treatments in Germany), Casey repeatedly texted and emailed Carroll imploring him to sign the Agreement and take the role leading Citizen Services. SOF, RE 77, Page ID # 1139.

17

After weeks of negotiation, Carroll finally signed the Agreement on July 25, 2019, to formally become the SVP of Citizen Services. SOF, RE 77, Page ID # 1139. Carroll's promotion resulted in him becoming the highest paid member of the Executive Committee (by $100,000), with a base salary of $450,000 (an increase of $93,000) and new substantial bonuses. SOF, RE 77, Page ID # 1139. Casey announced the restructuring under which Carroll would lead Citizen Services (of which Trusted Fan was the most important business line) and Scott was promoted to SVP of Public Security (combining Enrollment Services and Public Security businesses into a single unit). SOF, RE 77, Page ID # 1140. Perhaps most importantly, despite the voluminous correspondence between Casey and Carroll during the negotiations of his promotion, Carroll never told Casey or anyone else at IDEMIA that he believed he was being "forced" out of his role in Enrollment Services due to his age or disability. SOF, RE 77, Page ID # 1140.

## X.    CASEY CONTINUES TO HAVE SIGNIFICANT CONCERNS WITH CARROLL'S PROGRESS AND LEADERSHIP OF TRUSTED FAN

Throughout the period of the negotiation with Carroll, including before Carroll signed the Agreement, Casey continued to express his concerns to Carroll regarding the Trusted Fan business model and progress. SOF, RE 77, Page ID # 1140-1141. Carroll continued to forecast that Trusted Fan would generate tens of millions of dollars in revenue. SOF, RE 77, Page ID # 1141. Casey told Carroll

that he did not believe that Carroll's business model could possibly generate the millions of dollars in revenue Carroll was projecting – the math simply did not work. SOF, RE 77, Page ID # 1141-1142. Carroll repeatedly pushed back on Casey's concerns with unrealistic assumptions about the adoption rates he expected, even though it is undisputed that Carroll's team had conducted minimal research to determine whether the high adoption rates on which the revenue and profitability forecasts were based. SOF, RE 77, Page ID # 1142.

Notwithstanding his continuing skepticism and concerns with Carroll's progress on developing a viable business plan for Trusted Fan (or whether the business model could *ever* be viable), Casey continued to provide support for Carroll's development of Trusted Fan. SOF, RE 77, Page ID # 1143. Casey approved budgets for hiring, a dedicated marketing budget, incentive plans for expediting development of technology, and actively recruited other members of the ExComm to assist Carroll. SOF, RE 77, Page ID # 1143. Casey also attempted to intervene with expediting the development of the technology platforms that Carroll claimed to need. SOF, RE 77, Page ID # 1144-1145. Finally, Casey allowed Carroll and his team to travel to meet with a marketing consulting agency in New York that specializes in technology and innovation to help form the marketing strategy. SOF, RE 77, Page ID # 1145. The reason for Casey's ongoing efforts to

support Carroll's development of Trusted Fan were simple: IDEMIA's (and Casey's) successful execution of the VCP and its revenue goals were directly tied to Carroll's promises of millions of dollars of revenue from Trusted Fan. SOF, RE 77, Page ID # 1146. Simply put, for Casey's own survival as CEO, Trusted Fan could not fail.

## XI.    CASEY ORDERS A REVIEW OF CARROLL'S BUSINESS MODEL

At the end of July 2019, IDEMIA started its preliminary budget planning cycle for 2020. SOF, RE 77, Page ID # 1147. Carroll and his team continued to project substantial Trusted Fan revenue in 2020 ($7 million in EBITDA), and Carroll continued to request approval for marketing agreements that would require payment of millions to several sports teams. *Id.* Given the serious doubts he harbored about the business model, Casey needed assurance Carroll's projections were realistic, and that Trusted Fan was on track to generate the substantial revenue Carroll was projecting. *Id.* Casey asked Ben Mallen, SVP and Chief of Staff, to meet with Carroll and his team in Franklin, Tennessee, to review the Trusted Fan model and vet the financial assumptions on which the projections were based. *Id*. In preparing for his visit, Mallen evaluated the Trusted Fan business and Carroll's progress toward executing on the model and sent an email to Carroll and Casey outlining the numerous areas that required <u>urgent</u> attention – a

clear sign that Mallen also did not believe that Trusted Fan was on track. SOF, RE 77, Page ID # 1148.

When he arrived in Franklin the following week, Mallen was even more alarmed by the lack of execution and progress with Trusted Fan. SOF, RE 77, Page ID # 1148. It quickly became clear to Mallen that Trusted Fan could not possibly meet the revenue and profitability projections that Carroll and his team had presented to Casey as part of the VCP. *Id.* Mallen's evaluation confirmed Casey's suspicions that the assumptions on which Carroll's revenue projections were based were flawed, as the projections relied on unrealistic estimates of adoption by season ticket holders and attendees at events, estimates that had no viable support and were not based on any reliable data. SOF, RE 77, Page ID # 11480-1149. Mallen also confirmed that the operating model was not workable, the technology was not nearly mature enough to allow IDEMIA to scale the business at the rate Carroll was predicting, the sponsorship fee model did not make sense, there was no plan for product development, and Carroll's team did not have any specific target dates for Trusted Fan to be operational. SOF, RE 77, Page ID # 1149-1150. Mallen was deeply concerned to find that Carroll and his team had not even prepared a basic project plan identifying what steps were needed for Trusted Fan to become a viable, operational business (a standard business practice). SOF, RE 77, Page ID #

1150. Mallen left Franklin knowing that, under Carroll's leadership, the process of turning Trusted Fan from a concept into a viable, operating business was in complete disarray. SOF, RE 77, Page ID # 1150–1151. Mallen informed Casey that he believed Carroll was incapable of executing this extremely important project. SOF, RE 77, Page ID # 1151.

## XII.  CASEY VISITS CARROLL'S OFFICES AND CONFIRMS TRUSTED FAN IS NOT VIABLE

Mallen's evaluation and visit to Franklin confirmed Casey's suspicions about the innumerable problems in the Trusted Fan business model and that Carroll's team was not on track to generate any revenue, much less the substantial revenue that Carroll had consistently promised. SOF, RE 77, Page ID # 1151-1152. Casey decided to visit Franklin so that Carroll and his team could provide a full business review for Casey and his key advisors. SOF, RE 77, Page ID # 1152. On September 16, 2019, Casey, Mallen, and Ajay Amlani (SVP of Consumer Services and Corporate Development) traveled to Franklin to meet with Carroll and his team to review the Trusted Fan business model. SOF, RE 77, Page ID # 1152. The meeting confirmed Casey's worst fears – Carroll and his team were nowhere near ready to make Trusted Fan operational and there was little to support Carroll's revenue projections. SOF, RE 77, Page ID # 1153. To make matters worse, Carroll had very little grasp of the details of the sole business for which he was

responsible. SOF, RE 77, Page ID # 1153-1154. Carroll was unable to answer basic questions about the business model, had no proof of concept, and due to the numerous failures in the model, Carroll could not provide any objective basis for his projections that the Trusted Fan concept would generate tens of millions of dollars in revenue in 2020. SOF, RE 77, Page ID # 1154.

For example, one of Carroll's key assumptions was that IDEMIA would charge an enrollment fee for a customer to have access to the Trusted Fan services, yet Carroll did not even know what a customer would be willing to pay because Carroll's team had not done any research – even though it was already September of 2019 and Carroll had projected significant revenue for 2020. SOF, RE 77, Page ID # 1155-1156. Another example involved Carroll's plan to negotiate with a sports team to offer Trusted Fan to its season ticket holders as part of the season ticket renewal process. SOF, RE 77, Page ID # 1156. Although this was a material part of Carroll's revenue assumptions, he did not yet have agreement with the sports team and, more importantly, did not even know basic details about how the plan would work – including when the season ticket renewal process would begin (a critical detail if IDEMIA were to see any revenue from the team in 2020). SOF, RE 77, Page ID # 1156. It was obvious that Carroll had no idea how or when Trusted Fan could ever produce net-positive revenue, did not have a concrete plan

for turning the concept into a viable business, and had not been forthright about either Trusted Fan's progress or the financial projections provided to Casey and the Group as part of the VCP. SOF, RE 77, Page ID # 1157.

Casey, Mallen, and Amlani left the meeting in Franklin with the conclusion that Carroll had not been forthcoming about Trusted Fan's progress, that Carroll's business model would never be profitable as it currently stood, and that Carroll was not capable of executing the project to successfully make Trusted Fan a profitable business. RE 77, Page ID # 1157. Mallen and Casey both agreed that Carroll's failure of communication and lack of progress was wholly unacceptable, especially given the importance of Trusted Fan to IDEMIA's strategy for growth (as evident by its inclusion in the VCP). SOF, RE 77, Page ID # 1157-1159. Casey concluded that he needed to make a leadership change and that Carroll needed to be exited from IDEMIA if there was any hope of saving Trusted Fan. SOF, RE 77, Page ID # 1159-1160. In fact, Casey discussed the matter with Delabriere, who fully supported Casey's decision in light of Carroll's failure to appropriately manage Trusted Fan and the significant budget gap that would result in 2020 as a result of Carroll's failure of leadership. SOF, RE 77, Page ID # 1161.

## XIII.  IDEMIA TERMINATES CARROLL'S EMPLOYMENT

On November 6, 2020, Casey informed Carroll his employment with IDEMIA was ending. SOF, RE 77, Page ID # 1161-1162. Carroll was informed that his termination was due to his failure of leadership of Trusted Fan and his performance. SOF, RE 77, Page ID # 1161-1162. Casey told Carroll that he no longer had responsibilities for IDEMIA and that IDEMIA would contact him to discuss the terms of separation. SOF, RE 77, Page ID # 1162-1163. Shortly after this conversation, IDEMIA and Casey learned that, among other things, Carroll had failed to disclose significant conflicts of interest, including an undisclosed ownership interest in an IDEMIA vendor with which Carroll had contracted on behalf of IDEMIA to provide electronic tablets and Carroll's retention of his girlfriend to perform services for IDEMIA without disclosing the relationship. SOF, RE 77, Page ID # 1163. Casey also learned of expense report irregularities, including over $90,000 in expenses for car services (likely limos) in 2019 alone. SOF, RE 77, Page ID # 1164. IDEMIA retained a third-party to oversee an investigation of Carroll's conduct. SOF, RE 77, Page ID # 1164. The investigator substantiated the concerns about Carroll, including that Carroll had undisclosed conflicts of interest. SOF, RE 77, Page ID #1164. Karen Gregory, IDEMIA's Vice President of Human Resources, informed Carroll on November 21, 2019, that his

employment with IDEMIA would be terminated effective as of that day for underperformance and misconduct. SOF, RE 77, Page ID # 1165.

Following Carroll's termination, IDEMIA undertook a comprehensive review of the Trusted Fan business and determined that it was completely unviable and could never generate anywhere near the substantial revenue Carroll had projected. SOF, RE 77, Page ID # 1165. IDEMIA abandoned the Trusted Fan business model altogether and wrote-off approximately $4 million dollars invested between 2018 and 2019. SOF, RE 77, Page ID # 1165. IDEMIA has not hired a Senior Vice President of Citizen Services or otherwise replaced Carroll as a leader of the Trusted Fan business. SOF, RE 77, Page ID # 1165. [5]

## XIV. PROCEDURAL HISTORY

On October 19, 2021, Carroll sued IDEMIA alleging violations of the Americans with Disabilities Act and Amendments ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and the False Claims Act, as well as a breach of contract claim relating to Carroll's alleged right to severance and bonuses under the Agreement. Complaint, RE 1, Page ID # 1-28. On September

---

[5] Shortly after Carroll's employment termination, in November 2018, Casey hired Candy Curtin as Vice President of Human Resources; Curtin was over 60 at the time and, similar to Carroll, had battled cancer. RE 77, Page ID # 1166. Casey had previously worked with Candy Curtin, so he was aware she had cancer at the time he hired her. RE 77, Page ID # 1166.

22, 2023, IDEMIA moved for summary judgment on all four counts. Motion for Summary Judgment, RE 56, Page ID # 243-247. On November 22, 2023, the district court issued its Order granting IDEMIA's motion for summary judgment and dismissing the Complaint in its entirety on the merits and with prejudice. District Court Order, RE 93, Page ID # 1909. This appeal followed.

Carroll appeals the summary judgment in IDEMIA's favor with regard to his ADA, ADEA and breach of contract claims. Carroll has not appealed, and thus leaves undisturbed, the district court's grant of summary judgment to IDEMIA as to Carroll's False Claims Act retaliation claim.

## <u>SUMMARY OF THE ARGUMENT</u>

The material facts of this case are not in dispute. Plaintiff Charles Carroll ("Carroll"), a former senior executive with Defendant IDEMIA Identity & Security USA LLC ("IDEMIA"), was terminated because he failed to do the one job he was tasked with doing – developing and executing a business plan to turn a new business concept called Trusted Fan into an operating, revenue generating business line for IDEMIA. As Senior Vice President (a C-Suite position that came with a $450,000 salary and lucrative bonus opportunities), Carroll was the IDEMIA executive charged with leading the effort to operationalize this new business. Based on Carroll's representations that Trusted Fan would generate tens of

27

millions of dollars in revenue, IDEMIA made Trusted Fan the centerpiece of its growth strategy and placed its trust in Carroll to create a viable business model to generate the significant revenue he repeatedly promised was certain to come. Unfortunately, that trust was completely misplaced. The undisputed evidence shows that Carroll's leadership of Trusted Fan was an unmitigated disaster. Not only did Carroll fail to develop a viable, scalable business model, he also completely misled IDEMIA about the progress of the Trusted Fan business and the potential revenue that Trusted Fan could earn for IDEMIA, basing financial projections on completely unfounded assumptions that were made from whole cloth. In fact, despite millions of dollars of investment and years of commitment by IDEMIA, *Trusted Fan never earned a single dollar of net-positive revenue for IDEMIA under Carroll's failed leadership*. Indeed, Carroll's leadership in developing a viable business model was so flawed that after his termination, IDEMIA abandoned Trusted Fan and wrote off millions of dollars it invested based on Carroll's promises.

In the face of the virtually unassailable business reasons for the decision to terminate his employment, Carroll failed to come forward with any evidence to support his claim that he was terminated because of his disability or age. The only evidence to which Carroll points as evidence that the reasons proffered by

IDEMIA for his termination are pretextual (and that the real reason was his disability) are text messages and conversations between Carroll and Ed Casey (IDEMIA's former CEO) in which Casey expresses his support for Carroll's desire to seek experimental cancer treatment in Germany – communications which Carroll now disingenuously and opportunistically tries to paint as evidence of discriminatory animus. Carroll's attempts to rewrite history fall well short of the evidence required to show that IDEMIA's termination decision was unlawful.

At bottom, this case is about Carroll's disappointment and his belief that IDEMIA's assessment of his Trusted Fan business model and his failed leadership are wrongheaded. But the law makes very clear that Carroll's disagreement with IDEMIA's business decisions or his belief that the decision to terminate his employment were wrong or unfair are simply insufficient to survive summary judgment. That is especially true where, as here, there is a complete absence of any colorable evidence from which any jury could conclude that the decision was based on unlawful motives. For these reasons, the district court properly granted IDEMIA's motion for summary judgment and this Court should affirm.

## **LEGAL ARGUMENT**

## **I.    STANDARD OF REVIEW.**

This Court reviews the district court's grant of summary judgment *de novo*. *Briggs v. Univ. of Cincinnati,* 11 F.4th 498 (6th Cir. 2021). Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue exists for trial only if the evidence would permit a reasonable jury to return a verdict for a non-moving party. *Id.* at 248; *Smith v. City of Toledo*, 13 F.4th 508, 519 (6th Cir. 2021). However, a plaintiff is not entitled to trial on "the mere existence of some alleged factual dispute." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994), *cert. denied*, 516 U.S. 806 (1995). A plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When the non-moving party cannot present evidence to meet an essential element of his claim for which he must prove at trial, summary judgment is proper. *Celotex*, 477 U.S. at 322. Importantly, Carroll's subjective beliefs, speculation, and conclusory allegations cannot create a genuine issue of fact for trial. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir. 1992); *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986). Rather, Carroll must present "specific facts" and "concrete . . . affirmative evidence" that establish the existence of a genuine

issue of material fact that precludes summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). As set forth below, Carroll fails to do so here and, therefore, this Court should affirm.

## II.  THE DISTRICT COURT CORRECTLY GRANTED IDEMIA'S MOTION FOR SUMMARY JUDGMENT AS TO CARROLL'S CLAIMS OF DISABILITY AND AGE DISCRIMINATION.

The record is bereft of direct evidence of disability or age discrimination (and Carroll does not argue otherwise to this Court). Opinion Memorandum, RE 92, Page ID # 1894. Accordingly, Carroll's ADEA and ADA discrimination claims are both analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (applying *McDonnell-Douglas* to ADEA discrimination claims); *Blazek v. City of Lakewood,* 576 F. App'x 512, 516 (6th Cir. 2014) (applying *McDonnell-Douglas* to ADA discrimination claims). Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination (the elements of which differ slightly depending on the claim alleged). *See, e.g.*, *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238 (6th Cir. 2005). If the plaintiff makes the required *prima facie* showing, "the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the employment decision at issue." *Id.* Once the defendant meets this light burden of production, the

employment-discrimination plaintiff must prove by a preponderance of the evidence that the employer's proffered reasons are "actually a pretext to hide unlawful discrimination." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021) (citing *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 777 (6th Cir. 2018)). As set forth below, this Court should affirm because the district court properly concluded that Carroll did not and cannot meet his burden of proving that the reasons proffered by IDEMIA are pretextual or that the real reason for his termination was either disability or age discrimination. [6]

### A. IDEMIA Plainly Met Its Burden of Proffering a Legitimate, Non-Discriminatory Reason for Terminating Carroll's Employment.

There can be little dispute that IDEMIA has proffered a very legitimate basis for the decision to terminate Carroll. To meet this light burden of production, IDEMIA need only show that its proffered reason is supported by admissible

---

[6] For purposes of this appeal, IDEMIA does not devote pages here to whether Carroll is able to prove a *prima facie* case of disability or age discrimination. The Court can and should affirm the district court's entry of summary judgment based solely on Carroll's failure to present any evidence supporting a finding that the termination decision was pretextual such that a reasonable jury could find in Carroll's favor. Nonetheless, as set forth in its Motion for Summary Judgment, Carroll also failed to meet his burden of proving a *prima facie* case of either disability or age discrimination because he was not qualified for the position based on his performance. Memorandum in Support of Motion for Summary Judgment, RE 57, Page ID # 572-573.

evidence. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703–04 (6th Cir. 2007). IDEMIA has more than done so here.

IDEMIA submitted ***substantial and undisputed*** evidence supporting the business reasons for IDEMIA's decision to terminate Carroll's employment that were entirely unrelated to Carroll's disability or age. After his promotion, Carroll was the senior executive at IDEMIA solely responsible for overseeing the development and operationalizing of Trusted Fan – a business concept that was one of the centerpieces of IDEMIA's strategic growth plan. SOF, RE 77, Page ID # 1134, 1106-1107, 1108. IDEMIA presented undisputed evidence of IDEMIA's loss of confidence in Carroll due to his unmitigated failure to develop and execute upon a business strategy that would produce any revenue for Trusted Fan, including due to his continued advocating of an unviable business model, his failure to develop any business plan, and his false and misleading financial projections. SOF, RE 77, Page ID # 1141-1144, 1147-1161. There is simply no dispute that Trusted Fan was failing under Carroll's leadership and the evidence is undisputed that IDEMIA's decision to terminate Carroll was based on this failed leadership.

While Carroll disagrees with the assessment of his development and leadership of Trusted Fan, even he concedes that IDEMIA was unhappy with his

leadership. Carroll admitted in his deposition that Casey repeatedly expressed his concerns to Carroll regarding viability of the Trusted Fan business model. SOF, RE 77, Page ID # 1111-1112, 1140-1141. Carroll also concedes that "everyone was concerned about" Trusted Fan, although Carroll attempts to place all the blame for that concern at the feet of Digital Labs and IDEMIA's other leadership even though it is undisputed that Carroll was the executive with ultimate responsibility for the business. SOF, RE 77, Page ID # 1140-1141.

Thus, as a matter of law, the business reasons given for terminating Carroll's employment clearly supported termination of his employment. *See e.g., Jones v. Potter*, 488 F.3d 397 (6th Cir. 2007) ("Poor job performance, of course, is a perfectly legitimate, legal reason for firing an employee."); *Rosenthal v. Faygo Beverages, Inc.*, 701 F. App'x 472, 477 (6th Cir. 2017) (dissatisfaction with an employee's services is a legitimate nondiscriminatory reason for termination); *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 588 (6th Cir. 2002); *Howley v. Fed. Express Corp.,* 682 F. App'x 439, 446 (6th Cir. 2017) (poor managerial skills, or leadership failures are legitimate, non-discriminatory reasons for disciplining or discharging an employee) (citing *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 502 (6th Cir. 2011) and *Bowie v. Advanced Ceramics Corp.*, 72 F. App'x 258, 263 (6th Cir. 2003).). Indeed, Carroll's business model and

leadership were so flawed that IDEMIA was forced to abandon the entire Trusted Fan business after his termination because it was an unfixable business model, writing off millions of dollars IDEMIA provided Carroll to support his attempts to turn the untested concept into a revenue-generating business venture. SOF, RE 77, Page ID # 1160, 1165. If this is not a legitimate basis for terminating an executive's employment, it is difficult to imagine what would be.

### B.    Carroll Cannot Show IDEMIA's Legitimate Non-Discriminatory Reasons For His Termination Were A Pretext For Disability Discrimination.

Carroll simply has not presented any evidence from which a jury could reasonably conclude that IDEMIA's proffered reasons for termination are pretextual under the ADA (or, as set forth below, under the ADEA). A plaintiff can prove pretext "either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392 (6th Cir. 2008) (internal quotation marks and citation omitted). A plaintiff may demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. *Miles*, 946 F.3d at 888. "Pretext is a commonsense inquiry: did the employer fire the employee for the

stated reason or not?" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). A plaintiff cannot demonstrate pretext merely by showing the defendant's rationale was "mistaken, foolish, trivial, or baseless" so long as the defendant honestly believed in the rationale and based its belief on particularized facts before it at the time. *Hardesty v. Kroger Co.*, 758 F. App'x 490, 494 (6th Cir. 2019); *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009.) "Employers are entitled to 'greater flexibility' in management-level employment decisions, and we do not 'act as a super personnel department, overseeing and second guessing employers' business decisions." *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 611 (6th Cir. 2013). Here, the district court properly concluded that, in the face of the overwhelming evidence presented by IDEMIA, it was the failure of Carroll's signature project that resulted in his ouster, not his purported disability and this Court should affirm. Order Memorandum RE 92, Page ID # 1907.

> **1. Summary judgment was proper because Carroll did not present any evidence that the reasons given by IDEMIA are pretextual.**

Carroll does not come forward (because he cannot) with any cognizable evidence demonstrating that the reasons given for his termination are unworthy of belief, have no basis in fact, or were not the actual reason for the ultimate

termination decision. It is *undisputed* that numerous members of IDEMIA leadership (including Casey, Amlani, Delabriere, and Mallen) all believed that Carroll's business model was not remotely viable and that Trusted Fan – a cornerstone for IDEMIA's growth strategy and a significant part of its budgeted revenue – could never generate the revenue that Carroll had forecasted (forecasts that Carroll all but admits were pulled out of thin air). SOF, RE 77, Page ID # 1152-1161, 1165. In other words, the evidence is undisputed that Carroll - the C-Suite executive solely responsible for Trusted Fan and who was being paid hundreds of thousands of dollars a year – was terminated because he failed miserably in his leadership of Trusted Fan.

Other than his belief that Casey was wrongheaded in his assessment of Carroll's performance, Carroll does not present any evidence proving that IDEMIA's given reason for termination is false or unworthy of belief. In fact, on appeal, Carroll actually *admits* that the reasons given by IDEMIA for the termination decision were entirely legitimate, stating that he "does not dispute he was responsible for Trusted Fan, *nor that it was not making progress, nor meeting IDEMIA's revenue projections*." Appellant Br. at 47. (emphasis added). Given Carroll's admission, no reasonable jury could conclude that the reasons given by

IDEMIA are false or have no basis in fact such that Carroll can meet his burden of proving pretext by a preponderance of the evidence.

In the face of substantial uncontroverted testimony that IDEMIA believed Carroll's leadership of Trusted Fan was a failure, Carroll's subjective beliefs are insufficient to prove pretext. It does not matter if Carroll disagrees with Casey's assessment of the Trusted Fan business model or Casey's conclusion that Carroll's progress was unacceptable (which seems to be the crux of his argument both below and on appeal). The Sixth Circuit follows the "honest belief" rule, under which a plaintiff cannot demonstrate pretext merely by showing the defendant's rationale was "mistaken, foolish, trivial, or baseless" so long as the defendant honestly believed in the rationale and based its belief on particularized facts before it at the time. *Hardesty v. The Kroger Co.*, 758 F. App'x 490, 494 (6th Cir. 2019) (citing *Alvarez v. Des Moines Bolt Supply Inc.*, 626 F. 3d 410, 417 (8th Cir. 2010)); *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016). To overcome IDEMIA's invocation of the honest belief rule, Carroll "must allege more than a dispute over the facts upon which [the decision] was based. He must put forth evidence which demonstrated that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 286 (6th Cir. 2012). It is obvious that

Carroll disagrees with the decision or assessment of his leadership of Trusted Fan. But his subjective disagreement with the decision is not sufficient to overcome the abundance of evidence showing that IDEMIA had good reason to terminate his employment from a business perspective – which is supported by voluminous pages of undisputed testimony about Carroll's disastrous oversight of Trusted Fan. On this record, the Court must affirm the dismissal of the disability discrimination claim.

> **2.    Carroll's purported evidence of disability discrimination is insufficient to prove pretext.**

Carroll's case of disability discrimination hinges on three pieces of evidence that he erroneously believes demonstrate Casey's animus toward him based on his medical condition: (1) Casey's alleged comments that he did not want any "surprises" relating to Carroll's health; (2) Casey's knowledge and expressions of support (which were almost always in response to Carroll's initiation of communications regarding his health); and (3) the alleged short time period between Carroll's disclosure of his need to obtain treatment in Germany and his termination. None of these allegations, even if accepted as true, prove pretext.

First, the single alleged comment by Casey that he did not want any "surprises" (allegedly relating to Carroll's health, although that is not clear from the statement made) is insufficient to prove pretext. Once Carroll disclosed a health

condition to Casey, it was perfectly reasonable and lawful for Casey to have discussions about the impact of the medical condition on Carroll's ability to perform the job. *See EEOC v. Prevo's Fam. Mkt., Inc.*, 135 F.3d 1089, 1095 (6th Cir. 1998) (an employer may make inquiries into an employee's medical information to understand to what extent the employee is disabled and how the employee may be accommodated); *see also* 29 C.F.R. § 1630.14(c) ("A covered entity may make inquiries into the ability of an employee to perform job-related functions."); *see also* 42 U.S.C. § 12112(d)(4) (prohibiting an employer from inquiring about the severity of a medical condition unless it is "job-related and consistent with business necessity"). There is nothing improper with Casey – on a single occasion - ensuring that one of the key members of his executive leadership team (and the person responsible for one of IDEMIA's most important business divisions and initiatives) kept Casey informed of any changes in his ability to perform. And notably, Carroll *never* raised concerns about Casey's expressions of concern with his health prior to the termination of his employment – including during the time during which he was communicating with IDEMIA's head of Human Resources.[7] SOF, RE 77, Page ID # 1109-1110, 1135-1138, 1165.

---

[7] Carroll's reliance on the EEOC Guidance is misguided. The EEOC example differs in many respects, the most obvious of which is that Carroll expressly and repeatedly initiated discussions about his diagnosis and treatments with Casey.

Second, Casey's knowledge of Carroll's condition and expressions of sympathy and support (which were almost *always* in response to communications that *Carroll* initiated with Casey about his health) are insufficient to prove discriminatory animus. Carroll's evidence of disability discrimination rests exclusively on his subjective belief that Casey's inquiries about Carroll's health and expressions of concern were somehow not genuine. SOF, RE 77, Page ID # 1109 – 1110, 1135-1138, 1165. But the text messages tell an entirely different story and Carroll's attempts to mischaracterize Casey's legitimate, personal concern for Carroll's health are insufficient to prove pretext.[8] *See, e.g.*, *Parkhurst v. American Healthways Services, LLC*, 2106 WL 4591630 (M.D. Tenn. 2016); *see also Thorpe v. Alber's, Inc.*, 922 F. Supp. 84, 90 (E.D. Tenn. 1996). Carroll's claim that the communications between he and Casey show discriminatory animus are, in fact, a blatant misrepresentation of the undisputed record evidence.

Third, there is no evidentiary basis for Carroll's assertion that "[t]here was no discussion of moving Carroll out of his position until he began to divulge more details about his cancer treatments to Casey," a statement that is patently false.

---

Thus, even if Carroll's allegation regarding Casey's inquiry is believed, Casey had ample reason to discuss the matter with Carroll.

[8] Casey's hiring Curtin as a member of the ExComm is also contrary to any finding that Casey harbored discriminatory animus based on Carroll's disability or age. Curtin was over the age of 60 and also suffered from cancer at the time Carroll hired her to lead HR. SOF, RE 77, 1166.

Appellant Br. 38. Carroll admits he has no personal knowledge about when the discussions surrounding the separation of Enrollment Services and TF began. Response to Carroll's Statement of Material Facts, RE 90, Page ID # 1848-1849. As set forth above, the evidence is undisputed that discussions regarding splitting Enrollment Services and Trusted Fan began well before Carroll's disclosure of his need for treatment, as early as October 2018. SOF, RE 77, Page ID # 1128. It is also undisputed that the timing of the decision to combine Enrollment Services and the Public Security division under Scott's leadership was driven by IDEMIA's concerns about removing Carroll from overseeing the PreCheck program prior to the completion of the UES2 contract to avoid any risk to IDEMIA's bid for that business. SOF, RE 77, Page ID # 1121-1126.

Finally, Carroll's claim that his inquiry about MD Anderson days before his termination somehow shows pretext is also a blatant mischaracterization of the record evidence. Appellant Br. at 46–47. Casey's testimony regarding MD Anderson and reference to "serious cancer" related to Casey's own wife's battle with cancer, not Carroll. Response to Carroll's Statement of Material Facts, RE 90, Page ID # 18159. Moreover, the record is undisputed that Casey made the decision to terminate immediately after the September 2019 meeting in Franklin, before Carroll's inquiry about MD Anderson. SOF, RE 77, Page ID # 1152-1158.

42

### 3.  Carroll's other arguments in support of pretext are unavailing as a matter of law.

Carroll has also not adduced any other evidence that IDEMIA's legitimate non-discriminatory reason did not motivate IDEMIA to terminate Carroll's leadership. This particular method of demonstrating pretext requires the plaintiff to show that an illegal motivation more likely motivated the employer, and that the employer's explanation is a coverup. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The record is devoid of any evidence suggesting IDEMIA's reason for terminating Carroll did not actually motivate his termination, apart from his own self-pitying disbelief that his failure as a leader resulted in his termination. *See Carter*, 529 F. App'x 601, 610–612 (6th Cir. 2013). IDEMIA conducted a reasonable evaluation of the Trusted Fan program, and had an honest, and well-supported, belief that a change needed to be made if there was any chance of salvaging a project which IDEMIA had heavily invested. Order Memorandum RE 92, Page ID # 1884.

As a last-ditch effort, Carroll makes a series of roundhouses in the hopes that something will connect, but the opposite is true. For example, Carroll asserts that IDEMIA did not have documentation representing that performance concerns existed and highlights that no one told Carroll he was in jeopardy prior to termination. Appellant Br. at 46–47. The district court correctly addressed these

arguments by explaining that it is common and logical that Carroll had received positive performance reviews at the beginning of 2021, the year after his then business unit had won a major contract for the company. Order Memorandum RE 92, Page ID # 1884. But earlier positive performance reviews do not offset later behavior by the employee that leads to termination. *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 612 (6th Cir. 2013) (prior performance reviews does not establish that the employee continued to meet company expectations). In this case, Carroll's downfall was the result of cumulative poor decisions and failed execution or, from Mallen's and Casey's perspective, untruthful communication with the IDEMIA leadership regarding the progress of Trusted Fan. Order Memorandum RE 92, Page ID # 1905. Even if taken as true, the previous positive reviews of his performance do not immunize him from termination for the utter and complete failure of leadership with regard to Trusted Fan – a business on which both IDEMIA and Casey were counting for significant (and ultimately unrealized) revenue growth.

In addition, Carroll misstates undisputed facts in attempt to wish away the undisputed facts that supported his termination and prevent him from proving his claim by a preponderance of the evidence. Appellant Br. at 40. Contrary to Carroll's statements in his opening brief, it is undisputed that Casey began to

formulate a plan to separate Trusted Fan from Enrollment Services in November 2018, well before Carroll's trip to Germany. SOF, RE 77, Page ID # 1125-1126. In fact, these discussions started almost eight months prior to the reorganization which resulted in Carroll overseeing the Trusted Fan Program. In October 2018, Casey advised the Group CEO that he intended to move the Enrollment Services business (Carroll's then business unit) from Carroll to be under Scott and the Public Service business division after the UES2 process had been completed, a decision with which Delabriere agreed. SOF, RE 77, Page ID # 1128. Carroll also misstates (in fact, fabricates out of whole cloth) the record by implying that "Delabriere made it clear that one of his objectives was to get Carroll to pass along as much of his institutional knowledge and contacts as soon as possible to a younger employee." Appellant Br. at 38-39. No such evidence exists in the record. Finally, Carroll misrepresents the timing of his disclosure to Casey about the treatment in Germany; Carroll did not tell Casey that he intended to travel to Germany for experimental treatment until early June 2019. SOF, RE 77, Page ID # 1135.

In the end, Carroll's claims are based almost exclusively on his disagreement with business decisions Casey and IDEMIA made, including the decision to terminate his employment based on his assessment that Carroll's

leadership of Trusted Fan was a complete failure. But this disagreement with Casey's and IDEMIA's judgment is not a basis for proving pretext and cannot carry the day. As this Court has noted, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, so long as *its action is not for a discriminatory reason*." *Pelcha*, 988 F.3d 318, 329 (quoting *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 886 (6th Cir. 2020)). In the absence of *any* evidence that the decision to terminate Carroll's employment was based on his disability, this Court must affirm the entry of summary judgment as to Carroll's ADA claim.

### 4. The district court properly analyzed pretext and applied the "honest belief" rule.

Carroll's appeal in the instant case also relies largely on his argument that the district court somehow misapplied the honest belief rule. Appellant Br. at 2. Once again, Carroll clearly misapprehends the legal standards applicable to his claim. The honest belief rule protects an employer's right to make a good faith and reasonably considered decision based on the facts before it at the time. *Parks v. UPS Supply Chain Solutions, Inc.*, 607 F. App'x 508, 515 (6th Cir. 2015); *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626 (6th Cir. 2006) (the law does not require employers to make perfect decisions or decisions that others disagree). An employee can only overcome the "honest belief rule" by submitting evidence that

"the employer failed to make a reasonably informed and considered decision before taking its adverse employment action." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 322 (6th Cir. 2019). As the district court points out, "the fact that this approach is sometimes referred to as a 'rule' in its own right should not distract from the fact that it is, at its root, not an independent principle, but simply a faithful application of the pretext-focused approach embodied in *McDonnell Douglas*." Order Memorandum, RE 92, Page ID # 1903. A bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question and fails to create a genuine issue of material fact. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012); *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 286 (6th Cir. 2012).

The district court properly applied this "rule." The district court correctly focused the question of pretext by placing the burden on Carroll to demonstrate that the circumstances tend to prove that an illegal motivation was more likely than not the reason for termination than the one offered by IDEMIA. *See Carter*, 529 F. App'x 601, 611. The district court properly found that Carroll did not (and cannot) meet this burden in the face of IDEMIA's unassailable reasons for terminating his employment. As the district court noted, in the absence of evidence that "the entire Trusted Fan fiasco was somehow orchestrated to force Carroll out based on his age

47

or disability, what one is left with is the apparently agreed-upon fact that the product that Carroll was overseeing faced sizable expectations, which it failed to meet, after which Carroll was fired. Maybe the firing was justified, or maybe Casey foisted blame on Carroll in order to protect himself. In neither plausible scenario, however, was anything done to Carroll based on his age or disability." Order Memorandum, RE 92, Page ID # 1904. In fact, Casey's success as CEO was largely dependent on Carroll's success with the Trusted Fan model, and therefore, it would be illogical for Carroll to assert that the entire Trusted Fan fiasco was somehow orchestrated by Casey to force Carroll out. Carroll's failure would almost certainly seal Casey's fate as the new CEO so Casey could not have been motivated to orchestrate a scheme to force Trusted Fan to fail simply so that Casey could fire Carroll. SOF, RE 77, Page ID # 1126. Carroll has not presented any evidence here that could remotely call into question IDEMIA's and Casey's honest (and well-substantiated) belief that Carroll was failing in his leadership of Trusted Fan. The undisputed record shows that IDEMIA made a reasonably informed and considered decision to terminate Carroll's employment based on its *extensive* review of the Trusted Fan program. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). At the end of the day, it is a "common sense answer" – the business failed and the executive responsible was terminated.

48

Carroll relies heavily on *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019), to argue that an employer's honest belief can be penetrated by discrediting evidence. Appellant's Br. 37, 44-45, 47. *Babb* is wholly inapposite. In *Babb*, the employer terminated a CRNA for clinical errors. *Id.* at 313. However, hours after the termination decision a "smoking gun email" was sent to employees that *explicitly* identified the reason for termination as the employee's disability, her eyesight. *Id.* at 314. Further, the employee supplemented her own personal testimony with expert testimony stating that she did not violate the standard of care during the two alleged clinical errors which the employer cited as the termination reason. *Id.* Both of these pieces of evidence allowed the plaintiff to demonstrate pretext. *Id.*

The facts in *Babb* are factually distinct from the instant case in a significant way. Carroll cannot point to any evidence to call into question the credibility of the honest belief by IDEMIA and Casey that Carroll was failing in his leadership of Trusted Fan. Carroll has not offered any evidence of illegal motive, much less the "smoking gun evidence" offered by the plaintiff in *Babb*. Carroll's reliance on *Babb* is misplaced and does not support his unfounded efforts to prove pretext.

### C.    Carroll Cannot Show Pretext As To His ADEA Claim.

Carroll's ADEA claim is evaluated under the same *McDonnell-Douglas* burden shifting framework. *Schoonmaker v. Spartan Graphics,* 595 F.3d 261 (6th Cir. 2010). However, under the ADEA, it is not sufficient for the plaintiff to show that age was simply a motivating factor in the adverse action; rather, a plaintiff must prove by a preponderance of the evidence that age was the "but for" cause of the employer's adverse action. *Scheick v. Tecumseh Public Schools*, 766 F.3d 523, 529 (6th Cir. 2014) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78). For an employer to take an adverse action "because of age" means that age was *the* (not *a)* reason Carroll was terminated. *Id*. As set forth, Carroll cannot meet the heightened burden of showing that his age was the "but for" reason for termination of his employment and, accordingly, summary judgment was proper.

Carroll has not come forward in this litigation with *any* evidence showing that age played a factor in IDEMIA's decision to terminate, and certainly not evidence that meets the more exacting "but for" causation burden of proof under the ADEA. Carroll has not identified any comments by Casey (or anyone else at IDEMIA) from which a jury could reasonably conclude that Carroll's age was considered in the decisional process that led to his termination. *See Alberty v. Columbus Twp.*, 730 Fed. App'x. 352 (6th Cir. 2018) (affirming summary judgment where plaintiff failed to come forward with any evidence of age-based comments

50

by the decision maker); *see also Skelton v. Sara Lee Corp.*, 249 Fed. App'x. 450, 455 (6th Cir. 2007). In the face of the extremely strong business reasons for the decision to terminate Carroll, the lack of any such evidence certainly is not sufficient to meet the heightened "but for" proof of causation required for his claim to proceed. *Trapp v. TSS Techs., Inc.,* 485 F. App'x 757, 761 (6th Cir. 2012).

Carroll's only evidence of age discrimination is (1) the alleged discussions by others regarding age during ExComm meetings; and (2) Casey's alleged comments to Carroll during a dinner in Nashville. Neither are sufficient to prove pretext. This scant evidence of age bias is simply insufficient to prove that age was the "but for" cause of the termination decision.

At best, there is evidence that IDEMIA business leaders had a single meeting at which the cause of increasing health care costs (not an uncommon discussion at virtually every company in the United States) was discussed and that one of the causes that had been identified was use by the ageing workforce. This is a far cry from the giant leap that Carroll wants the Court to make here – that this means there was a general bias at IDEMIA against older workers and that this played a role in the decision to terminate Carroll. Further, Carroll has not presented a shred of evidence that the ExComm ever discussed *Carroll's* age in these meetings, or that Casey (the person who it is undisputed made the termination

decision) made any comments about age (whether about Carroll or otherwise) such that a reasonable jury could conclude that the termination decision was driven by his age.

Casey's alleged conversations with Carroll where they discussed their future plans regarding retirement likewise do not demonstrate discriminatory animus, especially considering the two are of similar age and Carroll can only point to a single conversation (at some unknown point in time, but prior to his promotion) that was completely unconnected to the decisional process leading to his termination. *See e.g., Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (asking about an employee's plans for retirement is not evidence of intentional age discrimination.); *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 327 (6th Cir*.); see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) ( relying on factors that correlate with age when making employment decisions does not necessarily constitute age discrimination). As a matter of law, this evidence is insufficient to prove Carroll's age was the "but for" cause of his termination, the evidentiary standard Carroll must meet to take his case to trial. *Trapp v. TSS Techs.*, Inc., 485 F. App'x 757, 761 (6th Cir. 2012).

Moreover, there is ample evidence to contradict a finding that age (or disability) played any role in the decision. Just months before Carroll was

terminated, Carroll was promoted and became the highest paid member of the ExComm. SOF, RE 77, Page ID #1140-1141. Under the "same actor" inference, IDEMIA is entitled to the presumption that it did not discriminate against Carroll solely based on his age when he was promoted just months before he was terminated. *See Garrett v. Sw. Med. Clinic*, 631 Fed. App'x 351, 357 (6th Cir. 2015). To rebut this presumption, Carroll must offer strong evidence of pretext to demonstrate discrimination. *See Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003) (en banc); *see also Buhrmaster v. Overnite Transp. Co.*, 61 F. 3d 461 (6th Cir. 1995). ("It is simply incredible . . . that the company officials who hired [plaintiff] at age fifty-one had suddenly developed an aversion to older people two years later"). Casey was aware of Carroll's health concerns and age from the beginning of his tenure as CEO at IDEMIA. Casey fought to keep Carroll employed and assist in any way he could regarding Carroll's ongoing treatments. Casey, having recently experienced cancer treatments when his wife had undergone treatment, offered to fly out to Germany to fly with him home so that he didn't need to be alone. Given the absence of any evidence of pretext, the district court properly granted summary judgment on Carroll's ADA and ADEA claim.

As with his claim for disability discrimination, Carroll's claim is based exclusively on his disagreement with the wisdom of the decision to terminate his

employment. But even if IDEMIA was ultimately wrong in determining that Carroll's behavior was not the ultimate cause of Trusted Fan's failure (as Carroll claims), Appellant Br. 37–41, that does not alone create a factual basis for concluding that the decision was pretext for discrimination or that discrimination was the "but for" reason for the decision. *See Braithwaite v. Timken Co.*, 258 F.3d 488, 495-96 (6th Cir. 2001) (ruling testimony that called into question whether misconduct actually occurred "is not sufficient to allow a rational juror to find" that employer's decision "was not based on a reasonable belief . . ..."). At bottom, Carroll has not presented any evidence that age played any role in the decision to terminate and, accordingly, this Court should affirm the dismissal of his ADEA claim.

## III.  CARROLL'S COMMON LAW BREACH OF CONTRACT CLAIM FAILS.

A claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract and (3) damages caused by the breach of contract. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). The focus is on the four corners of the entire contract, the circumstances in which the contract was made, and the parties' actions in fulfilling their contractual obligations. *Id.* Unless the contract is ambiguous, the contract language is

interpreted according to its plain terms and ordinary meaning. *BSG, LLC v. Check Velocity, Inc.*, 395 S.W.3d 90,93 (Tenn. 2012). Applying these ordinary tenets of contract law to the Agreement, Carroll's contract claims are baseless and must be dismissed.

Carroll's claim that he is entitled additional bonuses is belied by the plain language of the Agreement, which requires that he meet certain criteria for earning bonuses. First, it is beyond dispute that Carroll did not earn the bonuses for which he was eligible under Paragraph 3(a) of the Agreement. Paragraph 3(a) outlines five different bonuses and the criterion for earning the varying bonus amounts in 2019. SOF, RE 77, Page ID # 1139. The simple fact is that there is *zero* evidence in the record from which a jury could ever conclude that Carroll achieved the financial and personal goals on which payment of the bonuses were conditioned, as set forth in the Agreement itself.[9] There is no evidence in the record that Carroll met *any* of the criteria for earning the bonuses set forth in Paragraph 3(a), which were based exclusively on successfully turning Trusted Fan into a viable, profitable business. SOF, RE 77, Page ID # 1126. In fact, the only evidence is to the contrary and shows that Carroll did *not* achieve any of the criteria on which the

---

[9] It is undisputed that IDEMIA paid Carroll the $250,000 bonus set forth in Paragraph 3(b) of the Agreement. RE 77, Page ID # 1166. Accordingly, the Court should find that IDEMIA did not breach this provision of the Agreement.

bonuses were conditioned (including the I&S business unit meeting its 2019 business and financial targets), and he would not have done so even if his employment had continued. SOF, RE 77, Page ID # 1165.

Second, Carroll is not entitled to severance pay because it is undisputed that he was terminated for performance and misconduct. Paragraph 7 of the Agreement provides that Carroll would only receive severance if he was terminated "for reasons other than performance or gross misconduct," which is an unambiguous condition precedent for receiving severance. SOF, RE 77, Page ID # 1126. The evidence is overwhelming that Carroll was terminated because of his performance, a determination that was communicated to Carroll at the time his employment ended. SOF, RE 77, Page ID # 1164. Therefore, under the plain language of the Agreement, IDEMIA did not breach its obligation to pay severance.

Lastly, Tennessee does not recognize the covenant of good faith and fair dealing for at-will employees. *See McGee v. Best*, 106 S.W.3d 48, 67 (Tenn. Ct. App. 2002). Carroll's attempts to revive his contract on that theory are, thus, barred as a matter of law. The Court should affirm the district court's entry of summary judgment as to Carroll's breach of contract claim.

## **CONCLUSION**

For the reasons set forth herein, this Court should affirm the district court's well-reasoned and legally supported Order granting summary judgment in favor of IDEMIA.

Dated:    June 21, 2024

*/s/ Jeremy D. Sosna*

Jeremy D. Sosna, Bar No. 290233
jsosna@littler.com
Claire E. Welch, Bar No. 403789
cwelch@littler.com
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone:    612.630.1000

Attorneys for Defendant-Appellee

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with the Type-Volume Limitation, the Typeface Requirements, and the Type Style Requirements of Fed. R. App. P. 32(a) and with the Technical Requirements of 6th Cir. R. 28A(h).

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,986 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font, using Microsoft Word 365.

3.    The digital version of this brief filed herewith has been scanned for viruses and to the best of my knowledge, is virus-free.

Dated:    June 21, 2024

/s/ Jeremy D. Sosna
Jeremy D. Sosna, Bar No. 290233
jsosna@littler.com
Claire E. Welch, Bar No. 403789
cwelch@littler.com
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone:    612.630.1000

Attorneys for Defendant-Appellee

**ADDENDUM**

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| Docket Entry | Description | Page ID Range |
|---|---|---|
| 1 | Complaint | 1-28 |
| 56 | Idemia's Motion For Summary Judgment | 243-247 |
| 56-1 | Declaration of Ben Mallen | 248-278 |
| 56-2 | Excerpts of the Deposition of Charles Carroll | 279-379 |
| 56-3 | Declaration of Dennis Kallelis | 380-388 |
| 56-4 | Excerpts from the Deposition of Edward Casey | 389-441 |
| 56-5 | Excerpts from the Deposition of Krista Crawley | 442-484 |
| 56-6 | Excerpts from the Deposition of Donald Scott | 485-499 |
| 56-7 | Declaration of Jeremy Sosna | 500-540 |
| 56-8 | Deposition of Karen Gregory (Exhibit 9). | 541-550 |
| 57 | IDEMIA's Memorandum in Support of Motion for Summary Judgment | 551-588 |
| 58 | Statement Of Undisputed Facts | 589-648 |
| 60 | Exhibit 5 to the Deposition of Charles Carroll | N/A |
| 60 | Exhibit G to the Declaration of Jeremy Sosna | N/A |
| 60 | Exhibit 73 to the Declaration of Ben Mallen | N/A |
| 60 | Exhibit A to the Declaration of Dennis Kallelis | N/A |
| | Exhibit 18 to the Deposition of Edward Casey | |
| 60 | Exhibit 21 to the Deposition of Edward Casey | N/A |
| 60 | Exhibit 26 to the Deposition of Edward Casey | N/A |
| 60 | Exhibit 27 to the Deposition of Edward Casey | N/A |
| 60 | Exhibit 29 to the Deposition of Edward Casey | N/A |
| 60 | Motion Exhibit 6 which contains excerpts from the Deposition of Dennis Kallelis | N/A |
| 60 | Deposition Exhibit 64 from the Deposition of Krista Crawley | N/A |
| 76 | Carroll's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment | 1053-1085 |
| 77 | Carroll's Response to IDEMIA's Statement of Facts in Support of IDEMIA's Motion for Summary Judgment | 1086-1184 |
| 90 | IDEMIA's Response to Carroll's Statement of Material Facts | 1833-1862 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 21, 2024, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/Jeremy D. Sosna*
Jeremy D. Sosna, Bar No. 290233

4881-2736-7875.13 / 103228-1027